## Case No. 16,145.

UNITED STATES v. The REINDEER.[1]

[14 Law Reporter, 235.]

Circuit Court, D. Rhode Island. June, 1848.

COD AND MACKEREL FISHERIES — BREACH OF LI-
CENSES—FORFEITURE—CERTIFICATE OF PROB-
ABLE CAUSE OF SEIZURE.

1. By the act of congress of February 18, 1793 [1 Stat. 305], "if any vessel is employed in any other trade than that for which she is licensed, such vessel shall be forfeited." By the act of July 29, 1813, special licenses were granted to vessels engaged in the cod fishery, and bounties were given on the vessels complying with certain conditions. By the act of May 24, 1828 [4 Stat. 312], special licenses were granted to vessels engaged in mackerel fishing. Under these statutes, and in fact, how far cod fishing and mackerel fishing should be considered different trades or employments, —quære.

[Cited in U. S. v. Paryntha Davis, Case No. 16,003; The Grace Darling, Id. 5,651.]

2. But whether cod fishing and mackerel fishing are, under these statutes and in fact, different trades or not, vessels under a license to catch cod will not be forfeited by catching mackerel, so long as the catching of mackerel is incidental merely, and not the main object of pursuit.

3. To work a forfeiture under these statutes, the old employment must have been abandoned, and a new trade must be permanently and exclusively pursued.

4. The seizure of a vessel, which under a cod fishing license, had incidentally caught mackerel, is a municipal seizure, expressly provided for by acts of congress as justifiable, if a certificate of probable cause is given.

5. A certificate of probable cause will be given, if the officer making the seizure acts in good faith, and has reasonable grounds to suppose that the law has been violated.

[Appeal from the district court of the United States for the district of Rhode Island.]

This was a libel, instituted in the district court on the 23d of June, 1847, in behalf of the United States and Edward Wilbur, collector of Newport, and others interested. It alleged, that the schooner Reindeer, on waters navigable for boats of twenty tons, within this district, was seized on the 21st of June, 1847, for a violation of the laws of the United States, inasmuch as that she was licensed by the collector of Newburyport for the cod fisheries, and, while so licensed, engaged in the

---

[1] For the better appreciation of this case it should be stated, that fourteen fishing vessels, of which the Reindeer was one, that had taken refuge from a storm in the harbor of Newport, were seized at the same time, and informations filed against them separately, in the district court. Answers were put in. When the cases came on for trial, the government not being ready, the libels were dismissed. An appeal was taken to the circuit court, and allowed on the terms that the government should select one case as a representative case, the decision in which should settle all the cases. The government selected the case of the Reindeer, and the result is above given. The vessels were owned all along shore, and the great number of parties and the large amount in issue, as also the fact that the privileges of a class were at stake, gave the case great interest and importance.

mackerel fisheries, and thereby became forfeited. The answer was put in by William Stover, as agent for the owners, and averred: First, that the Reindeer had not been duly licensed for the cod fisheries, because, though enrolled for those fisheries, she had not asked for and obtained the previous examination and certificate which were necessary in the cod fisheries. Secondly, that if duly licensed for the cod fisheries, it was for one year, and that before the term expired she had a right to take mackerel, if time enough remained afterwards, as here, to fish for cod, the full period required by law. And thirdly, that a usage had long existed at that port to take out a cod license early in the season, and if mackerel were found in greater abundance than cod, to catch them; but not to count the time spent in taking them, in order to obtain the cod bounty; and that this usage applied to all cases where catching cod was meant to be the permanent employment, and mackerel only incidental. That such was the intent and employment of the Reindeer in this instance, and the mackerel taken, being 130 barrels, were caught only under such circumstances and intent; that time enough remained to fish for and catch cod, if they were found, so as to complete the usual period for doing it in order to obtain the bounty; and if mackerel should have been caught till too late for that object, the cod license would have been surrendered, and no bounty claimed, and a mackerel license taken out. The evidence in this case on both sides was very voluminous, and in some respects conflicting. The substance of it will appear in the opinion of the court.

Dist. Atty. Burgess and Mr. Pearce, for the United States.

Choate & Hallett, for respondents.

WOODBURY, Circuit Justice. In this case, the evidence on the part of the United States showed, that the usual license for the codfishery issued to the Reindeer on the 5th of May, 1847, for one year; and that there was on file in the custom-house at Newburyport the usual certificate required of her inspection and fitness for the codfishery, bearing the same date. This certificate was made a prerequisite for the bounty by a circular from the first comptroller, dated February 22, 1842. It was further shown by the libellants, that the Reindeer had lines, hooks, gaffs, a machine to grind bait, and all the tackle suitable for the mackerel fisheries, with a large number of barrels and salt. Several witnesses on the part of the United States testified, also, that the South Shore fishery, where the Reindeer was employed, between the Capes of the Delaware and Cape Cod, was a mackerel rather than codfishery in the spring. That some other vessels in company with the Reindeer had mackerel licenses, and were equipped in like manner; and that since the act of congress

of February, 1828, authorizing a separate mackerel license, it was not customary to fish for mackerel under a cod license. And it was contended, that the business of catching mackerel had so increased then and since, as to constitute a separate employment and trade.

On the part of the respondents, several witnesses testified that long before the act of 1828 it was customary, under a license for catching cod, to take mackerel if the latter offered in great numbers so as to make it more profitable, and to relinquish the bounty for cod in that event, if not fishing for the latter exclusively as long as four months in the year. It was farther shown, that in 1820 the secretary of the treasury issued a circular, requiring an oath, before receiving the bounty for cod, that four months at least had been spent in fishing for cod, without counting the time devoted to catching mackerel; and that most of the collectors who gave licenses to fishermen, had been in the habit of considering it legal still to take mackerel, when they appeared in abundance, though having a cod license, if catching the latter was only an incident to the former, or was not the chief employment contemplated when the vessel sailed; and that no forfeiture was claimed, if the time so spent in taking mackerel was not counted in order to obtain the bounty; that it was the usage since 1828 to issue a mackerel license in the first instance only, when the party had no intention to fish for cod during any portion of the time. It was further proved by the respondents, that different kinds of fish were often caught on the same ground; that one or the other would at times unexpectedly predominate; that if the opportunity to take the kind most plentiful was not at once improved, it was likely to be wholly lost by returning to port for a different license; and hence that a cod license was better for the success of the fisheries as a business, no less than for individuals, if other fish were allowed to be taken under it as an incident, or subordinate, when they offered in greatest abundance, and would not injure the government if no bounty was claimed on account of the time spent in taking other fish, whether mackerel, hake, or halibut. It appeared, moreover, that taking a mackerel license, under the law of 1828, as modified by that of 1836, though allowing the fishermen to catch any kind of fish most abundant, would deprive him of the bounty which was intended by the government, and was useful to encourage this nursery for seamen, if he happened to find cod most abundant, and devoted the proper time to catching them.

Some of the testimony showed it was customary, at certain ports, to deduct the time spent in catching other fish under a cod license, and some to deduct the whole trip. It was also proved that the Reindeer was equipped with tackle, &c., to take cod; though in the South Shore fishery so many spare lines and hooks are not needed, as on the Grand Banks, because so near the coast and places to receive supplies; that she was likewise prepared to take other fish, such as mackerel, if they offered in greater abundance, and that the general outfit in the South Shore fishery was much the same for cod and mackerel, except in the lines and hooks; that, in the cod fishery, fresh mackerel were caught always when practicable, for bait and for provisions on board, and that bait mills were often used; that the Reindeer had fished for cod daily, while at sea, since she reached the fishing ground, but had caught only a few quintals, and that mackerel had been the principal catchings, having been so abundant for three or four days of the time, while out, as to enable her to catch the large quantity she had on board; and that she had no intention to apply for the bounty, unless she fished for cod exclusively, before her license expired, the required length of time. It did not appear that any other instructions or circulars had been issued by the treasury department, bearing on this matter, than those before referred to; or that this seizure had been made by its direction, or after consulting it.

The present proceeding was founded on the 32d section of the act of congress of Feb. 18th, 1793 (1 Stat. 305). Among other things, that act provides, as to "any licensed ship or vessel," that: "If any such ship or vessel shall be employed in any other trade than that for which she is licensed, or shall be found with a forged or altered license, or one granted for any other ship or vessel, every such ship or vessel, with her tackle, apparel, and furniture, and the cargo found on board her, shall be forfeited." By this act, likewise, there is required an oath, "that the license shall not be used" for any other employment than that for which it is specially granted, and the license itself provides that the vessel shall not be employed "in any trade or business, whereby the revenue of the United States may be defrauded." The 4th section of the act also requires a bond to be given, to pay a penalty, if the "vessel has been employed in any trade, whereby the revenue of the United States has been defrauded during the time the license granted to said ship or vessel remained in force." Id. 307. Whatever may be the reason for the provision to forfeit the whole vessel, if engaging in any "other trade," it partakes more of the severe spirit of the last century, than of the present age, to impose so heavy a penalty for so slight an offence. The 5th section had already provided that any license should be in force, only while the vessel was owned by citizens, and not "in any other business or employment, than that for which she is specially licensed." But it did not forfeit the vessel in such cases, affixing such a severe penalty, only when the license was forged, or used for a ship not originally in-

tended. The 32d section, however, extended the forfeiture to all those cases, however light, but whether by inadvertence or design, is conjectural, and, to my mind, somewhat doubtful. To ascertain the real object of this harsh enactment, considering it as designed, is very important, in order to decide correctly whether it has been violated in the present instance. It can hardly be supposed, that so severe a penalty could be designed to punish a departure from a mere custom-house regulation, for the purpose of having accurate statistics or returns of the quantities of tonnage engaged in different branches of business. On the contrary, congress probably was looking more to the coasting than fishing licenses, both being embraced in the same law, and was regarding more the danger likely to be caused to the revenue, by the former engaging in the foreign trade and smuggling, rather than by the latter drawing bounties from the treasury, when in a different employment or trade from that of catching codfish. Hence it was made very penal to engage in what was different, so as to endanger the treasury by smuggling. So far as looking to the fisheries, it was designed, doubtless, merely to prevent getting bounties, without the training and exposure connected with the codfishery, as a great nursery for seamen. It looked, likewise, to security against bounties being obtained, when fishermen did not bring into the country the additional food and wealth, drawn from the depths of the ocean, in that fishery, and which it was a national object on that account, also to foster; or when they did not labor in competition with rival nations, encouraged by bounties in that fishery, and who would otherwise become triumphant over ourselves, and exclude us entirely from that great mine of riches and nautical skill.

The whole spirit of the penal part of the law and of the policy which led to it, so far as regards the fisheries, seems then to be to visit so severe a punishment only on those, who seek to obtain the public funds and public favor, while engaged in pursuits not made the object of those funds and favor. But if no forfeiture is incurred by such a culpable departure from the object of the statute, other consequences less penal may properly flow from a non-compliance with the laws, and were doubtless intended to be visited. Being engaged otherwise than the license specifics, whether it happen by fraud or misconception of the laws, or even by accident and mistake should probably deprive them of the bounty, though having a license valid on its face, because they would not do what is by law a condition precedent to the bounty. So, if engaged in one branch of business alone, but with an invalid license, it would prevent them from having the rights and privileges of an American ship, as contradistinguished from a foreign one. That is, she would be obliged to pay duties on tonnage and light money, like a foreign vessel, which

once were very heavy, and she must do this, because suitable American papers from the custom-house are alone allowed to exonerate vessels from such duties. That is virtually the effect of the 4th section before quoted, the license merely becoming null in such cases. See U. S. v. Rogers [Case No. 16,189]. And perhaps the chief object in requiring all American vessels to take such papers, was to furnish due evidence of such exemption, rather than preserve accurate data of the amount of tonnage employed in different branches of business, and from the different ports and states. But the failure to obtain the exemption from duties, would seem to be the usual and a sufficient punishment for neglect to take out valid papers. Something more ought to be done, and of a more dangerous character, before exacting a forfeiture of a vessel. In the case of a coasting vessel changing her employment to the foreign trade, which it is the chief object of the 32d section to prevent, the circumstances are very different. There the change is easily defined and understood, and the danger to the revenue by smuggling foreign goods on board is much enhanced, and hence a forfeiture in such a case may often not have been too severe. But in case of a vessel, licensed for the cod fishery; not changing her employment to either the coasting or foreign trade, so as to increase the facilities for smuggling; not making any change from the general business of fishing, compared with other employments in navigation, so as clearly to come within the penal provision at all; not asking nor receiving any bounty so as to injure the treasury while taking mackerel, rather than cod; not committing nor even alleging in the libel that she meditated any fraud, much less offering clear proof of either; and being induced to take papers and fish as she did, by advice of the revenue officers, and by long usage at the port whence sailing; all this surely makes out any thing but a plain case for inflicting such a severe penalty. If by strict law a penalty can be deemed thus incurred, it must be only where the facts show the vessel engaged in a different employment, and that the different employment was followed manifestly as a different trade, and under circumstances conflicting with the spirit as well as the letter of the act of congress. That this last is the proper rule in the construction of such penal statutes may be seen in the following cases. The Enterprize [Case No. 4,499]; 3 Cow. 89; [Wilkinson v. Leland] 2 Pet. [27 U. S.] 662; [Minor v. Merchants' Bank of Alexandria] 1 Pet. [26 U. S.] 64; [Elliott v. Swartwout] 10 Pet. [35 U. S.] 151; U. S. v. Kimball [Case No. 15,531]; Taber v. U. S. [Id. 13,722]; U. S. v. Wonson [Id. 16,750]. But while adopting this rule, I do not of course hold, that ignorance of the law is an excuse for the owners in violating it, though that ignorance existed in both them and the officers of government. "Ignorantia juris non excusat."

But some might doubt here, whether it was not ignorance in part of the fact, which led to this course; of the fact, that catching mackerel for a few days without abandoning the codfishery, was a different trade or employment; and ignorantia facti excusat (2 Coke, 3b; Plow 343; Broom, Leg. Max. 122); or at least they might doubt whether it was not a mixed point of law and fact of which they were ignorant, and as to which they might therefore be excusable, penally.

Again, as to the defence here connected with the long usage. An usage or custom which violates an express law, created by statute or perhaps any other way, may not protect one who breaks the law. See Taylor v. Carpenter [Case No. 13,785]; Noble v. Durell, 3 Durn. & E. [3 Term R.] 271; U. S. v. Buchanan. 8 How. [49 U. S.] 83. Certainly not, either instance, in civil cases, and from civil and not penal consequences, unless both parties, by an agreement or an usage, known and acted on publicly, and which virtually dispenses with the law so far as regards their own private rights, gives efficacy to the agreement or usage, without a strict conformity to a statute. Cookendorfer v. Preston, 4 How. [45 U. S.] 326; [Bank of Washington v. Triplett] 1 Pet. [26 U. S.] 25; 2 Burrows, 1221; [U. S. v. Tappan] 11 Wheat. [24 U. S.] 420. A party may. by assenting to a custom or usage. waive his rights under a statute; and in this way, too, may make a thing legal, which otherwise might not be "Consuetudo pro lege servatur." See cases, 2 Bac. Abr. "Customs," C. A public officer, however, possesses no power to dispense with the penal provisions of a public law, whether from usage or a mistake in its construction; and an offender cannot claim an exemption on that ground, when prosecuted criminaliter. Usage can be proved, also, to explain whether a voyage has been properly pursued or not under an insurance. Noble v. Kennoway, 2 Doug. 510; 1 Burrows, 341; 1 Camp. 503, 508. note. What course in certain places it may be customary to sail; in what manner a trade may be carried on at anchor, and probably what fish may be captured without amounting to a deviation, can all be proved aliunde the policy, and will protect the insured while acting within the usage. So usage to construe a law in a particular. is some evidence that the construction is right, or should remain. U. S. v. McDaniel, 7 Pet. [32 U. S.] 14.

But there is another aspect of this objection. which possesses more force by its rebuttal of the criminal intent, necessary to constitute guilt in most cases. It is often very doubtful, whether an act can be deemed penal. where all the customary and natural presumptions of guilt, sufficient when standing alone to convict, are repelled, and every criminal intent is expressly disproved. See The Harriet [Case No. 6.100]. If long silence on the part of the public organs to complain, does not, as in private affairs,

often give consent ([Bank of Augusta v. Earle], 13 Pet. [38 U. S.] 591; [Holmes v. Jennison] 14 Pet. [39 U. S.] 577), it is certain by a general rule, that there must be a malus animus in the accused to constitute an offence (U. S. v. Libby [Case No. 15,597]). An evil intent, to be sure, is to be inferred often from certain acts, and among them one is wilfully doing what the law forbids. 4 Durn. & E. [4 Term R.] 457; 2 Adol. & E. 612; Strange, 1146; 5 Burrows, 2667. Yet it deserves consideration, if shown that the circumstances. under which the act was done, rebut all intention to violate the law, whether punishment is proper; and it is very questionable, whether they do not constitute a perfect defence to the prosecution criminaliter. See The Emden, 1 C. Rob. Adm. 16. See also, cases of contraband on board, not known to the master or owner (1 C. Rob. Adm. 67, 104; 3 C. Rob. Adm. 143, 178), and U. S. v. Libby [supra], where persons came on board, not known to be slaves. In all these, the penal intent being wanting, the prosecution failed. So where, by advice of counsel, one swore to the truth of his schedule, though certain property was withheld under a supposed right, the case was considered to lack the criminal intent, necessary to constitute perjury. U. S. v. Conner [Case No. 14,847]. If the circumstances contradict the gist of the charge, this should be a bar to the prosecution, and not a mere ground of appeal to the uncertain mercy of the pardoning power. All are familiar likewise with the rule in cases of imputed fraud, that it is to be proved and not presumed, and the necessity which exists, of a fraudulent intent, generally, even to avoid proceedings, in civil matters on account of fraud. And no general maxim is sounder or more frequently applied to crimes—not civil liabilities—than "actus non facit reum, nisi mens sit rea." 3 Inst. 107. See cases, passim.

But I do not despair of the libel on these grounds alone, as they might be deemed in some respects novel, and are not necessary. Yet they appeal strongly to the court in favor of a liberal construction to protect a confiding class of people. who, in this case, did the acts complained of under the sanction, if not advice of the officers of government themselves, that had the execution of this branch of the laws in their charge, and who did these acts in conformity to a custom construing these laws in that manner in those places, very uniformly from the period of their enactment. Nor do I dwell on the hardship to honest, plain men being visited by penalties for breaking laws when adhered to, as read or interpreted erroneously to them by the public officers. That, however, furnishes a strong reason, by means of contemporaneous and long construction, to show that such a construction was the true one. Stuart's Case, 1 Cranch [5 U. S.] 299. The fact, too, of its open ex-

istence for such a length of time, rebuts any intent of citizens, by conforming to it, to do what is wrong by such conformity, and is another powerful argument in favor of adhering to this construction. Thus, Lord Ellenborough, observes: "It has been sometimes said, communis error facit jus; but I say, communis opinio is evidence of what the law is, not where it is an opinion merely speculative and theoretical, floating in the minds of persons, but where it has been made the groundwork and substratum of practice." Isherwood v. Oldknow, 3 Maule & S. 396; Garland v. Carlisle, 2 Cromp. & M. 95; Co. Litt. 186a. It becomes a very grave question, where law-makers and law-executors have long slept over conduct, as if not a departure from the law, whether the construction should suddenly be changed, and really innocent persons be insnared and prosecuted by a new construction. [Adams v. Jones] 12 Pet. [37 U. S.] 210. "Cotemporanea expositio est optima et fortissima in lege." 7 East, 199; 4 East, 327.

Finally, a construction so long and publicly prevailing, and this by the sanction of the local officers, and without any dissent by the treasury department, through instruction, correspondence or circulars, operates strongly in its support. 3 Atk. 576; 10 Ves. 338. "Quod non valet ab initio, tractu temporis valet." 1 Dod. 394, 395. And it is fortified even by the silence of congress itself, not legislating more specifically to prevent it, when knowing, as it must, the views which its own officers and the community had taken of the proper construction of the existing laws. Nor does this conclusion violate what seems a true rule to reach the proper construction, and enforce the real design of the law; because, under all the circumstances, what would appear to be the most appropriate course to settle, under the 32d section, the design or meaning of the words, "different trade, or employment"? Surely to adopt a construction, not departing from what has been long sanctioned, unless a contrary one is inflexibly required by law; surely the broadest and most liberal views, to sustain what accords with usage, and what prevents a forfeiture where no penal intent has existed. The design chiefly intended by this penalty, having, as already shown, been to prevent fraud on the revenue, the Reindeer, unless attempting that in some way, has not violated that main design. She had never asked for the bounty before or since her seizure, and no evidence exists that she ever meant to, even if continuing permanently to fish for mackerel, or if not fishing exclusively for cod, at least four months of her license, that being all the time required by law.

The cases which have so often been complained of, in and out of congress, in connection with the fisheries, are all of a different character. Those, where the bounty has been obtained by adding the time spent in catching mackerel to that spent in catching cod, and thus obtaining a bounty as well as drawback on the pickled mackerel, which the law did not in terms or spirit allow, led to the original circular of 1820, requiring an oath on that point, and led to actions for recovering the bounty back from 1829 to 1832. 3 Sen. Doc. No. 120, A. D. 1833, Report of Treasury Department. Others, which supposed unsuitable vessels for fishing on the Grand Bank, were fitted out, and the bounty obtained by not much either of exposure or fishing, led to the circular of 1841, requiring an inspection as to the condition and fitness of the vessel when licensed.

The precedents of these descriptions, then, apply to a state of facts radically different, and none of them stand in the way of exonerating these respondents from this penalty. But there are other strong reasons to show, that a forfeiture has not been incurred here. Two leading objections exist to a forfeiture in this case, besides the minor ones specifically examined already, and besides, that the spirit and design, as well as words of the law, contemplate no forfeiture when there has been no fraud on the revenue attempted, or no probability of fraud. They are, that by the letter of the law, the vessel must resort to a different employment from that named in the license, and follow it as "a trade," that is, as a business with permanency and constancy, or she cannot be condemned; and neither of these clearly happened here. Looking to general considerations and general principles, I should doubt much whether the catching of mackerel rather than cod is a different general employment, as it is still fishing, as much as the catching of cod was fishing. The case of a different general employment, in The Active, 7 Cranch [11 U. S.] 100, was that of transporting merchandise for hire, and this to parts unknown, and in violation of other laws. That was not only a distinct general employment, but required a different outfit, and fewer men training; as few for a vessel of 300 tons as for a fisherman of 80 tons; and hence not within the spirit of the bounty, to form a nursery for seamen; while in the present case, catching mackerel was not only the same general trade of fishing, but required a like outfit and like number of men. The bounty, to be sure, could not be claimed for the time spent in catching mackerel, because the act of congress gave it only for catching cod, and allowed a drawback for the salt used in pickling the mackerel, when they are exported, instead of a bounty. But still this does not impair the position, that for other purposes, and in other views, the employments, as employments, are similar, as being in the fisheries, and those of a like character as to outfits, skill, and habits. The words "trade," and "employment," should have a fair construction, looking to the complicated and mixed character of the business, and not a con-

struction metaphysical or insnaring. 5 Mass. 380; 15 Mass. 205; 4 Mass. 534; 12 Mass. 253; 7 Mass. 310, 523; 3 Mass. 215; 11 Pick. 487.

In most cases, "trade" is used in the acts of congress as contradistinguished from the "fisheries," rather than being a term applicable separately to every kind of fishing. Thus they speak of vessels engaged "in the coasting trade, or fisheries." 1 Stat. 7, 94, 360, 288. In most cases, also, of penalties, a word must mean in its commercial sense what would be a violation of the law, and not merely in a technical or etymological sense. See cases as to "sugar," "teas," &c. Taber v. U. S. [Case No. 13,722]; U. S. v. Breed [Id. 14,638]; [Scott v. Lloyd] 9 Wheat. [22 U. S.] 438; [U. S. v. One Hundred and Twelve Casks of Sugar] 8 Pet. [33 U. S.] 277; [Elliott v. Swartwout] 10 Pet. [35 U. S.] 150. And before a penalty should be deemed incurred, a transaction must come within both the word and the spirit of the law, as shown in the cases before cited. Such a construction would require us here, independent of the usage, to consider the employment or trade in fishing, not a different trade when it related to the same general business. So perhaps, though employed in a branch or ramification of fishing different in name, but not different in character, exposure, risks, and training. More especially would this be the proper construction, if it had been, as here, contemporaneous, long in force, and acquiesced in both by the public officers and congress. Still more proper would it be, if no fraud had been attempted under it, and no danger existed by it, not being without ample guards against any injury by it to the revenue or the treasury. And finally, what other construction could be expected to be put on the law, by the plain fishermen for whose government it was made. than that a different trade or employment from theirs was one not of fishing; and who, ever since this class followed their honest labors on the Lake of Galilee, have been accustomed to consider fishing, without reference to the kind of fish, as one general trade or employment; contradistinguished, for instance, from agriculture or manufactures, or the navy or merchant service. Such a class of citizens would seldom trouble their minds with metaphysical distinctions, and never think of cutting up the fisheries, like the polypus, into as many different trades as there were countless species of fish to be caught, from the sprat or alewife and smelt, to the halibut and whale. In short, it is all practically regarded as the trade or employment of fishing. rather than the coasting or foreign trade; and it seems conclusive on the preference of such a construction, if, beside all this, the different branch of business pursued was only incidental and temporary, or only subordinate, and not intended to be exclusive of the other, unless longer pursued and ultimately substi-

tuted for the other, and without then claiming any peculiar privileges or benefits belonging to the first branch. It is believed that of this last character was the catching of mackerel by the Reindeer in the present case while sailing under a codfish license. This is a question of fact as well as law on the facts. Now, in point of fact here, the cod and mackerel fisheries on the South Shore were so much alike as to require similar equipments and supplies, except in lines and hooks, and here she started with hooks and lines for cod as well as mackerel. Here she was certified to be suitable in strength and tackle for cod, and took the proper papers for catching them. Here, by positive evidence, she actually caught several quintals of cod, and fished almost daily for more. She had devoted but a few days to mackerel catching, though during those days they were found in great abundance, and most of her catchings had therefore been of them. She had come to no determination, however, not to fish more for cod, or not to devote exclusively four months to it before her license expired. There was yet ample time for doing this during her license, and during the fishing season. She had applied for no cod bounty whatever, and had evinced no intention to apply for it, unless fishing exclusively for cod full four months during her license. The case of The Harriet [Case No. 6,099] was just the reverse of this on the facts. The Reindeer also could not include the time, if she wished to do it, while catching mackerel beyond what she needed for bait and food, unless committing perjury through her owners or officers. The treasury had not thus, or in any other way, been defrauded, nor was it likely to be. To be sure, a door was open to it, as is always the case in all voyages, but perjury is not to be anticipated or presumed in any of them; and the guards, beside oaths. are strong, by information by revenue cutters, who speak these vessels, and write to the various ports where they belong if they are catching mackerel; and and examination of their cargo and crew, if suspected, can likewise be made. Often too in the end the fruits of their employment are the strongest witnesses by which to know what it has been. Nor is the government injured if pickled mackerel are on board beyond the quantity needed for provisions and bait, because time will be deducted equal to that probably spent in catching them, on account of the drawback likely to be obtained on them if exported, and the manifest impropriety of getting both that and a bounty for cod during the same period. So that full time must and can be left for the cod bounty, and full time for catching the mackerel, on which a drawback may be obtained. In this way, also, the government lose nothing, as it means to pay the cod bounty when four months have been spent in toils and dangers. and also allow the drawback on pickled mackerel, when caught in

other periods not included in the time counted for the cod bounty.

There is also a great gain to individuals and the public in this construction, as well as no tax to the treasury beyond what the law meant to impose. More fish are caught by the same number of persons, in the same voyage and same space of time. If cod offer, they can be taken; if mackerel, they can be taken; and this is not properly forbidden or ridiculously tabooed till the vessel can go back to port and obtain a different license, and the fish in the mean time have escaped to other seas. It is national as well as private economy to take at once whatever fish offer which are valuable and abundant; and the revenue cannot suffer thereby, if the times devoted to such are kept separate, and the case is not falsified by perjury so as to avoid detection of the real truth. But nothing of this last description had happened or been attempted here, and hence no fraud actually practised, which should work a forfeiture of the vessel. It is supposed, however, by the libellants, that notwithstanding these general reasons for not considering the catching of mackerel, as in the present case, a different trade from the catching of cod, as intended by the act of congress of 1793, it is meant to be regarded as different by the act of 1828. Without any judicial decisions on this point, I should have been inclined to hold, that though different for some purposes under the act of 1828, it is not by that act or any other declared to be different so as to incur a forfeiture, if pursued when under a cod license, and if no attempt is made to compute the time towards the four months required to obtain the cod bounty. But if the adjudged cases hold otherwise, and if, because mackerel are not the same specific fish caught, and not placed under the same specific license as cod since the act of congress of 1828, nor rewarded nor encouraged by congress in precisely the same form, these differences amount to enough to constitute in law a different trade or employment; then the next and last general defence to be relied on here is, that the catching of mackerel in the present instance had not been pursued long enough and exclusively enough to violate the act of 1793, and incur a forfeiture of the vessel. In other words, that here, the catching of mackerel, as a trade, had not in fact been followed as a separate employment or trade, distinct from that of catching cod, and the latter abandoned. If it had, though no bounty had yet been demanded for the time so spent, and none may have been meant to be, it is argued that the act of congress has been violated, and the forfeiture incurred. It is supposed by the libellants, that both of these principles were settled against the respondents in the case of The Nymph [Cases Nos. 10,388 and 10,389]; and have been again confirmed in the case of The Harriet [Case No. 6,099]. See, also, The Active, 7 Cranch [11 U. S.] 100; The Eliza [Case No. 4,346].

I do not feel disposed here to go into and impugn the law on this subject, so far as actually settled there, though the construction adopted was very vigorous for a penal prosecution. In my apprehension those cases do seem to decide the first objection against the respondents. They hold that now the mackerel fishery, when exclusively pursued as an employment, constitutes a distinct employment from catching cod; and that though this was not the rule formerly, it is so since the act of 1828, granting a mackerel license, reinforced by the act of 1836, permitting all kinds of fish to be taken under a mackerel license 4 Stat. 312; 5 Stat. 16. The reasons of this construction do not all strike me with force as already explained; and besides that, a mackerel license is only "authorized," but not required by the act of 1828. But supposing those reasons to be sound for the purpose of the inquiry in the present case, the other question, how far on the facts the catching of mackerel must be followed, in order to constitute a separate employment or trade in it, or in other words, to make one be considered engaged in it as a trade, was not decided there, except on the particular facts of those cases. The facts there differ materially from those here. The facts in the case of The Nymph, which is the leading case, are in some important respects so unlike those here, as to require and fully justify very different conclusions, as to the mackerel catching having become a different trade on board the vessel. There, the time spent since the vessel sailed, had been so long devoted to mackerel, as not to leave enough to become entitled to a cod bounty, though the rest of the term should be devoted wholly to codfishing. The fact was entirely the reverse here. There, likewise, more than half the whole period of the license had been devoted to a different species of fish than the license covered. But here not one eleventh of the whole period of the license had been so devoted; and but a few days, very successful ones to be sure, of only the thirty-two or three since she had reached her fishing ground. There, in fine, the catching of cod seems to have been long and entirely abandoned, while here the catching of cod had been continued or attempted almost daily, up to the seizure, though not with great success. But ample time was still left for it to be successful, if fish offered; and yet to be pursued exclusively quite four months before the license expired. It is not a fault in the vessel if cod do not bite; provided the crew try to catch them, they fulfill their duty. In point of fact, there as well as here, the employment or trade, originally licensed or contemplated, viz., the catching of cod, had not here been abandoned, and another employment or trade assumed instead of it. In The Harriet [supra], Justice Story says, as to the fact of pursuing another kind of fishery as an employment, such as the hake fishery, so as to incur a penalty,—"Before I should be prepared to adopt such a conclusion, I should require the

most determinate and satisfactory evidence, that the hake fishery was intentionally and exclusively carried on during the season, as a principal employment of the Harriet, in contradistinction to the cod fisheries." So the case of The Nymph no less than The Harriet, concedes, that a vessel under a cod license may pursue other business, which is incidental, or which does not amount to an entire change of her original business, being as a species of interlude, or an "aside," or parenthesis in it. She may catch mackerel, for instance, for bait, or for food on board ship, any thing which is incidental, merely. But beyond that, if, in doing what is incidental, she happens to strike such large schools, as to pull in more than are so needed at once, it cannot be that she must halt midway in their biting, and refrain to pull in one extra mackerel, or forfeit the whole vessel. That is a kind of self-restraint not to be expected of a fisherman. On the contrary, the true meaning of the case of The Nymph, especially as explained in The Harriet, corresponds with what is a rational view of the act of congress itself, that to constitute a different trade or employment. other fish-catching must not be carried on for so long a time, and to such an extent as to become a new permanent business, and the old one appear to be abandoned. Such clearly had not become the case here, where this seizure took place, whatever it might possibly have become before the voyage would have ended, if undisturbed. It may happen frequently that much can be done in one trade or employment, which is not strictly incidental or closely attached to that, yet so entirely subordinate to it as not to be considered a new trade or employment. It is occasional, and not constant or permanent. As in most professions or trades pursued by individuals, other business, like agriculture with lawyers or physicians, or some mechanic art with farming is at times attended to, not as a distinct or separate trade or calling, but as a minor or subordinate business, mixed with the other when leisure may permit, or taste or relaxation require it. The other avocations also may be profitable, but still they are not the profession or business of the individual, unless the principal pursuit is abandoned or changed for them. That is the test. Thus in The Harriet, large quantities of hake were fished for and caught. But that was not enough. It must become an exclusive employment. Justice Story said:—"If under color of a codfishery license, the mackerel fishery was in fact carried on as an exclusive employment, the practice was an abuse of the license," &c. The Nymph [supra]. But it was only these. This is a rational view, looking to the whole subject-matter.

From the very nature of ocean fisheries, where so many different kinds of fish abound, and live in the same seas and latitudes, and even on the same feeding grounds, the fisherman is often compelled, in some degree, to take different kinds of fish, whether he seeks them or not. The same hook, bait and line will answer for several different kinds, and till they come to the surface, or are drawn into his boat, the fisherman cannot determine which he has caught. To be sure, where different hooks and lines are necessary, then the chance is greater with him; but the technical departure from the strict license of the law, as to cod alone, is committed in either case. But in either, can the law be so harsh, unless he makes a real and permanent change in his trade or employment, as to punish him with a penalty for catching any thing except cod? or require him to throw into the ocean again every thing which is drawn to the surface, except cod? As if he derived his right to catch any kind of fish in the ocean from government, instead of God and nature, and was a criminal, if not confining himself to such fish alone, as congress specially permits in any one license. However valuable the halibut, or hake, or mackerel, or however fine a whale offers on the coast, he is not voluntarily, if impelled by the ruling passion, to hook, or harpoon, or catch him in any way in his power, and add so much to the common wealth of the country. No, what the law forbids, is fraud, is evasion of the revenue, is an entire change of business, permanently, without duly following it up, with a change of papers or license, as soon as is convenient and practicable.

But the law, in a case like this, never meant to restrain capturing what was wild, and taking "the good the gods provide," when no prior rights of others are violated. Nor can one or two indulgences of this kind, or parts of one or two weeks thus employed, while in the pursuit of codfishing also, though with less success, be regarded as making it a new and exclusive and permanent employment, and the former one as abandoned. To forfeit the whole vessel, there must be a clear departure from the law, a clear change of business, as a business, and not acts of a temporary and subordinate and innocent character in interludes, and under a strong temptation, and without injury to any one. But the evidence here does not show an entire abandonment of one employment, and an exclusive occupation in another. There is still another difficulty in connection with this. I entertain doubts whether this seizure was not in every view premature, and it certainly was before sufficient proof existed of any intent, either to defraud the revene, or change the employment for the voyage as a voyage. It seems to me, that in a penal law, where a forfeiture is demanded for a change of employment, without a new license, the government and its officers before seizure, must wait till it becomes clear that no new license to cover the change of employment, if at sea, is meant to be taken out, as well as that the employment has been permanently changed, so as to require a new one. In such cases, the change of fishing happens on the ocean, where the old papers of the ship cannot be surrendered, and new ones taken

out. It is an exigency which must be improved at the moment to take other fish, when offering in large numbers, or not take them at all. The argument ab inconvenienti, by a different course could hardly be stronger in any case. The bounties of Providence are to be slighted, and its gifts refused, or the other fish must be taken, and nobody injured thereby. Why not let them be taken in such a tempting crisis; in such an opportunity to add to national and individual wealth; in such a privilege of hunting and fishing on the great highway of the world, as is not per se wrong, and belongs to all mankind, by nature and the law of nations? Why is such an act to be punished as a crime, and the useful fisherman, when indulging in it, to be insnared by penalties, before he can come home with his honest earnings, and change his license, if he has been induced to change entirely the employment contemplated when he sailed? The object of the license seems to some extent to have been misconceived. We have no royal fish here like the whale on the coasts of England, belonging to royalty, and to be taken only under licenses from government, or used only by the government. The real object of the license here is, not to confer a right to catch any animal that swims in the ocean, that right being derived from a higher source than government. 4 Durn. & E. [4 Term. R.] 437; 2 Branch, 472; Gro. de J. B. c. 2, § 2, note 3. And it is protected by the law of nations, on the ocean; and even on its shores it belongs here rather to the regulating sovereign power of the States, than of the general government. See U. S. v. New Bedford Bridge [Case No. 15,867], and citations there. But the license, or the action of government in respect to it here, is merely to confer an incipient claim, if afterwards duly perfected, to receive a bounty or drawback, and to be exempted from certain duties imposed on vessels not duly registered, enrolled, or licensed as American vessels. There is a case (U. S. v. Rogers [Id. 16,189]) where a vessel, engaging in a new trade, on going to a new place, different from that licensed or stipulated, was held even to cease to be American, so that a revolt on board would not be punished by American courts. Generally as to duties on tonnage, they must also be paid as if foreign vessels, unless having proper American papers, and any question as to the bounty cannot be decided, till the voyage is ended, or till it has gone so long as to show clearly what must be its principal employment, and hence whether the claim to it should be enforced. It is not merely that a locus penitentiæ exists till his voyage has ended, which was the case of the Nymph, and no change in papers was there made or proposed; but it is that till the voyage is ended or chiefly ended, no decisive evidence is usually furnished, whether the business or trade has been permanently changed or not; and whether the vessel has still time enough left to fish for cod alone, so as to be entitled to the bounty, or

means during the season to change the license, so as to correspond with any new employment permanently pursued.

By various considerations, the character of the employment in fishing during most of the voyage, is to fix it for the trip or season, and not its character for a few weeks, or even months, perhaps short of a majority of the whole. Hence, in the case of The Harriet [Id. 6,099], the court looked to the new or changed employment, "during the season." And though the words of the act of congress are, shall not, &c., "during the period for which licensed," do thus and so, yet it would be too narrow, if construed so as to require them to do this for the whole period, in order to commit an offence, instead of some time within the period. This done, some time must, however, be continued, sufficient to give a character to the act. The new employment must be long enough, or so clearly different, as to show a permanent change in the vessel's business. See The Harriet [supra]. A rule like this, requiring clearly a new permanent employment or trade, is clear as laws should be, and not vague, nor uncertain, like "some," or "considerable" other employment. It is also the common sense aspect of the subject, the only practical one which has any fixed principle as a guide. Like questions of domicile, this looks to intents, as well as acts, to decide whether a change has occurred; see Burnham v. Rangely [Case No. 2,176]; and intents not ambiguous, and acts not equivocal, but both clearly developed in favor of a permanent change of trade. In the case of The Active, 7 Cranch [11 U. S.] 100, the fishing was utterly abandoned, and a cargo of produce or merchandise taken in, doubtless, for the foreign trade, and a sailing commenced in the night for ports unknown, and in violation of the embargo law, and at a place where new papers could be at once obtained, if desiring and entitled to them. This showed clearly, not only a new trade or employment resorted to in that case, but permanently, and without any view of taking out a new license to cover the new trade and the new illegal voyage. See, also, U. S. v. The Mars [Case No. 15,723]; The Eliza [supra].

In the present case, no new trade was permanently and exclusively pursued; no determination had yet been formed or evinced to abandon entirely the old employment, and, consequently, no occasion had yet arisen to decide whether to take out new papers, or to attempt it, or not. The seizure, therefore, was premature. It was before the facts showed clearly that a forfeiture was proper, and that a violation of the 32d section of the act of 1793 had been manifestly committed. It is the end which usually crowns the work, and which usually must unite to designate the nature and character of the voyage. Taber v. U. S. [Id. 13,722]. By these conclusions we are happy not to come in collision with any sound principle, or any precedents.

It ought, perhaps, to be added here, that the

inspection on file at the custom-house, showing that the Reindeer was well manned and equipped for the codfishery, prevents her from being acquitted on the first ground set up in the defence, that she never had been duly inspected as well as licensed. It may not prove that the owners requested it, but that the inspection was duly made, is clear. Something ought perhaps to be said as to some general features of the case, which have been urged earnestly in the argument, and some of which relate to the existence of probable cause or not for filing these libels. On the one hand, the idea of instituting qui tam actions, or extorting forfeitures of vessels from fishermen, merely because they caught some other fish than cod, while sailing under a cod license, without intending or attempting to count the time to obtain a bounty while so employed, and without intending to abandon the codfishing while finding cod to catch, during the rest of the voyage without changing their regular employment. or if changing it, without meaning not to change their license as soon as they returned, probably never entered into the heads of congress, and certainly not of the treasury department. The last does not appear ever to have given any such instructions, nor to have been consulted on the present occasion, nor made any attempt to take a penal advantage of any innocent error.

But the seizure appears to have been made by subordinate officers; and in their behalf, it is some excuse, that they had been concerned in another district in the seizure of the Nymph, and had some reason for supposing that the conduct of these vessels was not legal on account of its similitude, in part at least, to what was censured there. No wanton wrong was. therefore, probably intended by these seizures, though they were very disastrous ones, and hardly necessary in anywise till the voyage and season were ended, considering how much of it remained, and that the vessels all belonged to ports near by. Certainly it is a great misfortune, that some fourteen of these vessels, without any consultation or advice from the proper department, so easily communicated with, should, early in their voyage,—quietly at anchor in the harbor of Newport, their grand rendezvous in bad weather,—be all, with 130 men, on board. seized like outlaws and foreigners, and a whole year's industry in many cases frustrated if not destroyed, though known to belong to a neighboring state, where they could be prosecuted after their voyage was ended, if doing wrong, as was the Nymph, the case relied on for a precedent. While, under all these circumstances, it is difficult to suppress sympathy in behalf of so hardy, and honest, and gallant a race of men, as the American fishermen, and while courts in all cases, and as to all classes, should feel anxious to protect innocent intentions and honest industry, and particular services, from severe penalties, intended only for illegal attempts on the treasury, or for wilful and wanton departure from the laws. the community may be assured that any self-willed or fraudulent evasions of the acts of congress can never be entertained by this tribunal.

Believing in this case, however, that no breach of the laws was really meditated or committed, I am happy to be able, on legal principles, to relieve the owners from the entire loss of their vessels, which, in addition to their other disappointments and onerous expenses in the vindication of their rights, would be so fatal to them. As in this case, also, I shall always be most happy to find, that acts of the citizen, which the officers of the government have long considered as lawful, and have long allowed to be done with impunity, and which, so done openly for many years, have never been by new proceedings more clearly forbidden by congress, can be shielded from prosecution and forfeiture, by a fair construction of the laws, and without any new or peculiar danger to the revenue.

It is a further consolatory reflection in this case, that if congress wishes to have the law different from this construction, it is very easy to effect it, though it should be unfortunately by throwing new restrictions and difficulties in the path of the honest fisherman, and new obstacles in the rearing up, in this fine nursery, more of our young men to fight the battles of the republic on the ocean; and by imposing new burthens on them in competition with this more privileged class in other countries, and new penalties and forfeitures, though not trying improperly to draw bounties or drawbacks, but only to exercise freely on the waves the sacred natural right from Providence, of taking every fish, which may offer, for their own advantage, as well as for the increase of our national wealth and greatness.

The libel must be dismissed.

This case was argued at Providence, November, 1847, and the opinion delivered there in June, 1848, at an adjourned term. At Newport at the regular session, during the same month, a decree was made that the libel be dismissed, without any taxable costs against or in favor of either side. But in the district court the claimants had paid certain fees of the clerk, marshal, &c., which in all the fourteen cases depending amounted to the sum of $588. This they moved to have refunded, and opposed any certificate of probable cause for the seizure to the officers who made it, and who had applied for such a certificate.

WOODBURY, Circuit Justice. The court considered it proper, that the claimants of the vessel, discharged on the merits, should not be compelled to pay any kind of costs. Unless by a positive requirement of statute, an innocent party ought never to be mulcted in costs any more than in damages. It was

hard enough when acquitted to be deprived of costs, and would be much more so if forced to pay costs. The decree will therefore be, as to all the fees of officers from the commencement of this case, that they be paid as the act of congress of Feb. 28, 1799 [1 Stat. 624], directs: which is in substance, that the officer informing must pay them when the vessel is not forfeited, unless the court certifies that a reasonable ground existed for the seizure. If they certify that, then the fees must be paid by the United States. This provision was made to protect the officer, when acting in a public capacity, if he appears to have acted reasonably, and on probable grounds of belief that the laws had been violated. This course is not burthensome to the government, while it is just to their agents if faithful. The only remaining inquiry here is, were they faithful? and are they entitled to such a certificate? That those officers erred in this case, has already been decided by us. But that is not enough to deprive them of such a certificate, or officers never could have one. Because it is only in cases of error that they need a certificate. What then is the true test as to the propriety of granting one? It is, that though the seizure was wrong, there was ground for suspicion of a breach of the law. Locke v. U. S., 7 Cranch [11 U. S.] 339. Here, a large quantity of mackerel on board, and only a small quantity of cod, furnished some such ground. Another test is, whether, though the property seized is discharged, real doubts exist as to the true construction of the law. U. S. v. Riddle, 5 Cranch [9 U. S.] 311. Here such doubts existed, according to the opinion of the court heretofore delivered, and the forfeiture was overruled only after a careful scrutiny and serious difficulty in construing the law supposed to be violated.

Still another test is, whether the officer informing appears to have honestly entertained an opinion, that the forfeiture had been incurred. Otis v. Watkins, 9 Cranch [13 U. S.] 339. Here, though the seizure was a most unfortunate one for the owners, for reasons before assigned, yet nothing of malice or oppression is disclosed under all the circumstances. No rivals in the mackerel fishing or mackerel selling appear to have interfered and instigated the seizure, but the captain of the cutter, who informed, seems to have acted from his former experience, in the case of The Nymph. He appears, however, to have overlooked the fact, that the voyage there had advanced much further, and the change of employment to have become certain and fixed; and he does not seem to have been aware of the subsequent doctrines laid down in the case of The Harriet, that a forfeiture is not incurred, unless another kind of fishing is pursued, so long and so exclusively as to show the old kind abandoned, and a new one substituted, not merely subordinate or temporary. We do not see, however, but that he acted in good faith, and had reasonable grounds to doubt whether the law had not been violated. It is suggested, finally, that this is a municipal case, and that no power exists to give a certificate in such a case. Dunl. Adm. Prac. 309. But if that impression was correct, the certificate could do no harm. It is, however, a case connected with the revenue, with shipping papers to affect the national character of the vessel, and the tonnage duties imposed on her, and sometimes the duties on the fish brought in, whether American or foreign. A prize case, or a seizure jure belli, needs no certificate for protection, if probable cause in truth existed. The Palmyra, 12 Wheat. [25 U. S.] 1; The Marianna Flora, 11 Wheat. [24 U. S.] 1. Probable cause, however, is no justification of seizure in a municipal case, as contradistinguished from a prize case, unless some statutory provision makes it so. The Appollon, 9 Wheat. [22 U. S.] 373; The Palmyra, 12 Wheat. [25 U. S.] 1. But the present case is one of those municipal seizures, expressly provided for in several acts of congress, as justifiable, if certificate of probable cause is given. See Acts of March 2, 1799, § 89 [1 Stat. 695]; 28th Feb., 1799 [1 Stat. 622]; 24th Feb., 1807 [2 Stat. 422]. And if the certificate be refused in such cases, the party seizing is liable in damages. The Appollon, 9 Wheat. [22 U. S.] 373; Gelston v. Hoyt, 3 Wheat. [16 U. S.] 246. Let a certificate of probable cause be prepared.