**UNITED STATES of America, Plaintiff,**

v.

**TSUDA MARU and her fishing gear, furniture, appurtenances, stores, fish and cargo, Defendant,**

**and**

**Hoko Fishing Company, Limited, Claimant.**

**No. A79–31 Civil.**

United States District Court, D. Alaska.

May 24, 1979.

Alexander O. Bryner, U. S. Atty., Dan E. Dennis, Asst. U. S. Atty., Anchorage, Alaska, for plaintiff.

John H. Bradbury, Bradbury & Bliss, Anchorage, Alaska, for defendant.

MEMORANDUM AND ORDER

von der HEYDT, Chief Judge.

THIS CAUSE comes before the court on claimant's motion to dismiss the complaint for forfeiture.

On January 17, 1979, the Japanese fishing vessel Tsuda Maru arrived within the fishery conservation zone established by the Fishery Conservation and Management Act of 1976 (FCMA), 16 U.S.C. §§ 1801–22 (1976).[1] The vessel reported its presence

---

1. 16 U.S.C. § 1811 states:

    There is established a zone contiguous to the territorial sea of the United States to be known as the fishery conservation zone. The inner boundary of the fishery conservation zone is a line coterminous with the seaward

and position to the U. S. Coast Guard and announced its intent to commence fishing as authorized by its permit issued pursuant to 16 U.S.C. § 1824.[2] On January 25, 1979, personnel of the United States Coast Guard Cutter Morgenthau sighted the Japanese fishing vessel Tsuda Maru approximately 167 miles southwest of Saint Matthew Is-

boundary of each of the coastal States, and the outer boundary of such zone is a line drawn in such a manner that each point on it is 200 nautical miles from the baseline from which the territorial sea is measured.

2. 16 U.S.C. § 1824 states in relevant part:

§ 1824. Permits for foreign fishing

(a) In general

After February 28, 1977, no foreign fishing vessel shall engage in fishing within the fishery conservation zone, or for anadromous species or Continental Shelf fishery resources beyond such zone, unless such vessel has on board a valid permit issued under this section for such vessel.

(b) Applications and permits under governing international fishery agreements—

(1) Eligibility.—

Each foreign nation with which the United States has entered into a governing international fishery agreement shall submit an application to the Secretary of State each year for a permit for each of its fishing vessels that wishes to engage in fishing described in subsection (a) of this section.

(2) Forms.—

The Secretary, in consultation with the Secretary of State and the Secretary of the department in which the Coast Guard is operating, shall prescribe the forms for permit applications submitted under this subsection and for permits issued pursuant to any such application.

(3) Contents.—

Any application made under this subsection shall specify—

(A) the name and official number or other identification of each fishing vessel for which a permit is sought, together with the name and address of the owner thereof;

(B) the tonnage, capacity, speed, processing equipment, type and quantity of fishing gear, and such other pertinent information with respect to characteristics of each such vessel as the Secretary may require;

(C) each fishery in which each such vessel wishes to fish;

(D) the amount of fish or tonnage of catch contemplated for each such vessel during the time such permit is in force; and

(E) the ocean area in which, and the season or period during which, such fishing will be conducted;

and shall include any other pertinent information and material which the Secretary may require.

(4) Transmittal for action.—

Upon receipt of any application which complies with the requirements of paragraph (3), the Secretary of State shall publish such application in the Federal Register and shall promptly transmit—

(A) such application, together with his comments and recommendations thereon, to the Secretary;

(B) a copy of the application to each appropriate Council and to the Secretary of the department in which the Coast Guard is operating; and

(C) a copy of such material to the Committee on Merchant Marine and Fisheries of the House of Representatives and to the Committees on Commerce and Foreign Relations of the Senate.

.     .     .     .     .

(7) Establishment of conditions and restrictions.—

The Secretary shall establish conditions and restrictions which shall be included in each permit issued pursuant to any application approved under paragraph (6) and which must be complied with by the owner or operator of the fishing vessel for which the permit is issued. Such conditions and restrictions shall include the following:

(A) All of the requirements of any applicable fishery management plan, or preliminary fishery management plan, and the regulations promulgated to implement any such plan.

(B) The requirement that no permit may be used by any vessel other than the fishing vessel for which it is issued.

(C) The requirements described in section 1821(c)(1), (2), and (3) of this title.

(D) Any other condition and restriction related to fishery conservation and management which the Secretary prescribes as necessary and appropriate.

.     .     .     .     .

(11) Issuance of permits.—

If a foreign nation notifies the Secretary of State of its acceptance of the conditions and restrictions established by the Secretary under paragraph (7), the Secretary of State shall promptly transmit such notification to the Secretary. Upon payment of the applicable fees established pursuant to paragraph (10), the Secretary shall thereupon issue to such foreign nation, through the Secretary of State, permits for the appropriate fishing vessels of that nation. Each permit shall contain a statement of all conditions and restrictions established under paragraph (7) which apply to the fishing vessel for which the permit is issued.

land in the Bering Sea at latitude 58 degrees and 38 minutes north, longitude 176 degrees 15 minutes west. The Tsuda Maru was one of a group of four vessels fishing in the area. The Tsuda Maru was contacted by the Morgenthau for the purpose of identification and informed by the Captain of the Morgenthau that the Coast Guard wanted to board one of the four vessels on the following day, January 26. The Coast Guard Cutter left the area and returned on the 26th to board the Tsuda Maru for a routine inspection. National Marine Fisheries Services Special Agent David Flannigan and Ensign John Leonard, U.S.C.G., boarded the Tsuda Maru and searched the vessel under the authority of the Fishery Conservation and Management Act without a warrant. No explicit consent for the search was requested or received from the Master of the ship. During this inspection Agent Flannigan and Ensign Leonard compared the ship's cumulative catch log with their estimates of the amount of frozen fish stored on the ship. After double-checking their estimates Flannigan and Leonard concluded that there had been an intentional underlogging of the incidental catch and recommended the seizure of the vessel to their superiors. The vessel was detained until Ensign Leonard received a "no objection" to the seizure from the United States Coast Guard Commandant in Washington, D. C. On January 27, 1979, the vessel and her documents were seized and taken to Kodiak, Alaska, where she arrived on February 1, 1979. Upon her arrival the ship was again searched without a warrant and an actual physical inventory of the frozen fish was made disclosing a discrepancy between the vessel's log and the frozen fish in possession of approximately 10.21 metric tons. The same day the decision was made to search the holds for the purpose of estimating the amount of surimi.[3] No warrant was obtained for this search which resulted in an estimate of a large underlogging of the surimi. On February 6, after consultation with the U. S. Attorney in Anchorage, the Tsuda Maru was again searched without warrant and a more accurate estimate was taken which disclosed a discrepancy between the ship's log and the surimi on board of approximately 150 metric tons.

On February 7, 1979, the United States filed its first amended complaint for forfeiture of the defendant vessel, Tsuda Maru, for violation of 16 U.S.C. § 1821[4] and § 1857[5] and the implementing regulations, 50 C.F.R. §§ 611.9(d)(2)(vi), (vii), and (viii) and 611.9(d)(3).[6]

---

**3.** "Surimi" is a processed fish product prepared on board the factory ship from the daily catch primarily for sale in the Japanese market.

**4.** 16 U.S.C. § 1821(c)(1) states:

(1) The foreign nation, and the owner or operator of any fishing vessel fishing pursuant to such agreement, will abide by all regulations promulgated by the Secretary pursuant to this chapter, including any regulations promulgated to implement any applicable fishery management plan or any preliminary fishery management plan.

**5.** 16 U.S.C. § 1857(1)(A) states

It is unlawful—
(1) for any person—
(A) to violate any provision of this chapter or any regulation or permit issued pursuant to this chapter.

**6.** 50 C.F.R. § 611.9(d) states in relevant part:

(d) Daily Cumulative catch log. (1) All foreign fishing vessels shall maintain a daily cumulative catch log in English. This log shall have recorded on a daily and a cumulative basis all catches of all species during the permit period. The log shall be maintained aboard the vessel during the duration of the permit period. (2) The log must contain the following information:
(i) Name and call sign of the vessel.
(ii) Permit number.
(iii) Date.
(iv) Species by common name and species code number (see Appendix I).
(v) Fishing area and area code number where caught (see Appendix II).
(vi) Daily catch by species to the nearest tenth of a metric ton.
(vii) Disposition of the catch: human consumption, fishmeal, or discard; and
(viii) Cumulative total catch for each species in each fishing area.
(3) This daily cumulative catch log must be in the format illustrated in Appendix III (which contains the instructions for completing the log) and must use the species name and species code number as specified in Appendix I and the area name and area code number as specified in Appendix II. No adjustment shall be made in this log to deduct any catch off-loaded. The log must record this information for each of the species for

The claimant Hoko Fishing Co. Ltd., moves the court to dismiss the government's complaint on the ground that the search of the Tsuda Maru was invalid without a warrant and that the seizure of the Tsuda Maru and her documents was invalid without a warrant. While the facts recited above indicate that the level of suspicion or cause varied as the incident progressed, for the purposes of this motion the court has assumed that there was no articulable suspicion or probable cause to believe a violation of law had taken place at the time the initial boarding and routine inspection took place. If this inspection was invalid the subsequent searches and seizures would likewise be invalid as the fruits of an invalid search. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In determining whether this warrantless routine inspection to enforce the Fishery Conservation and Management Act was valid the court must first find authorization for such an inspection in the FCMA and then determine whether such an authorization is consistent with the Fourth Amendment.

At all times the Tsuda Maru was fishing within the fishery conservation zone established by the FCMA. She was authorized to fish in that zone because of a Governing International Fishery Agreement between the United States and the Government of Japan and a permit issued under the ·FCMA. Without both the agreement and the permit the Tsuda Maru could not fish within the conservation zone. 16 U.S.C. § 1821(a).

■ The FCMA requires every such international agreement to acknowledge the exclusive fishery management authority of the United States. 16 U.S.C. § 1821(c). The Act expresses "the sense of the Congress that each such agreement shall include a *binding commitment,* on the part of such foreign nation and its fishing vessels, to comply with the following terms and conditions . . . ." *Id.* One of the conditions is that

which the vessel's flag nation has an allocation (see § 611.21). For example, record the catch of seamount groundfish broken down

any officer authorized to enforce the provisions of this chapter (as provided for in section 1861 of this title) be permitted—

(i) to board, and search or inspect, any such vessel at any time,

(ii) to make arrests and seizures provided for in section 1861(b) of this title whenever such officer has reasonable cause to believe, as a result of such a search or inspection, that any such vessel or any person has committed an act prohibited by section 1857 of this title,

16 U.S.C. § 1821(c)(2)(A)(i) and (ii).

16 U.S.C. § 1861(b) states that

[A] [a]ny officer who is authorized . . . to enforce the provisions of this chapter may—

(1) with or without a warrant or other process—

. . . . .

B) board, and search or inspect, any fishing vessel which is subject to the provisions of this chapter;

C) seize any fishing vessel (together with its fishing gear, furniture, appurtenances, stores, and cargo) used or employed in, or with respect to which it reasonably appears that such vessel was used or employed in, the violation of any provision of this chapter.

The regulations promulgated under the Act likewise make it unlawful for any person to refuse to permit an authorized officer to board a fishing vessel subject to such person's control for the purpose of conducting any search or inspection in connection with the enforcement of the Act. 50 C.F.R. § 611.7(a)(4).

The agreement with the Government of Japan provides that:

The Government of Japan shall take appropriate measures to ensure that each fishing vessel of Japan fishing pursuant to this Agreement for living resources off the coasts of the United States, allow and

by pelagic armorhead (080), alfonsin (081), and other species (099).

assist the boarding and inspection of such vessel by any duly authorized official of the United States . . .

Agreement Between the Government of the United States of America and the Government of Japan Concerning Fisheries Off the Coasts of the United States of America, Article XI, Section 1.

The permit that allows the Tsuda Maru to fish in the zone incorporates the regulations promulgated under the Act into the permit, including 50 C.F.R. § 611.7(a)(4).

■ The claimant argues that this combination of agreement, statutes and regulations required the Coast Guard and the National Marine Fisheries Service to obtain a warrant before an inspection of the Tsuda Maru could take place. The claimant places much emphasis on the statutory phrase "with or without warrant" and argues that by this phrase the Congress intended that the enforcement agencies obtain a warrant, except in exigent circumstances. The court finds no merit in this contention. The statutory language lends itself to the interpretation that Congress wished to emphasize that enforcement of fishing regulations in the conservation zone was not to be inhibited by the warrant requirement. It would probably come as a surprise to the Congressmen who voted to establish these regulations that their efforts to remove the warrant requirement from enforcement procedures would be used as a reason to impose it. *See* House Rep. No. 445, 94th Cong., 2nd Sess. *as reprinted* in 2 U.S.Code, Congressional and Administrative News pp. 593, 644 (1976). The Fishery Conservation and Management Act of 1976 clearly authorizes warrantless inspections or searches of fishing vessels licensed under it for the purpose of enforcing the Act. It should be emphasized that this case does not involve use of the warrantless search provisions of the Act to enforce other statutes or to discover other criminal activity. *Cf. United States v.*

*Warren,* 578 F.2d 1058, 1079–86 (5th Cir.) (Fay, J., dissenting) (dissenters in Fifth Circuit en banc opinion objected to routine Coast Guard inspection under 14 U.S.C. § 89(a) being used to enforce drug conspiracy statutes because the intrusion was no longer limited to the purpose of the statute).

■ The civil forfeiture of the Tsuda Maru sought by the government pursuant to the FCMA comes within the protection of the Fourth Amendment.[7] *One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965). *See also See v. Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). The question remaining is whether the warrantless search authorized by the FCMA is consistent with that Amendment.

■ A search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant except in a carefully defined class of cases. *Camara v. Municipal Court,* 387 U.S. 523, 528–29, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). One of the recognized exceptions to the search warrant requirement is searches of licensees authorized by statute in an industry that is "pervasively regulated", *United States v. Biswell,* 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972) and "long subject to close supervision and inspection." *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970). "[B]usinessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade . . . The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Almeida-Sanchez v. United States,* 413 U.S. 266, 271, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973).

We have little difficulty in concluding that where, as here, regulatory inspections further urgent federal interest, and

---

7. The Fourth Amendment to the U. S. Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

the possibilities of abuse and the threat to privacy are not of impressive dimensions, the inspection may proceed without a warrant where specifically authorized by statute.

*United States v. Biswell,* 406 U.S. at 317, 92 S.Ct. at 1597.

The important federal, and even international, interests at stake in the enforcement of the fisheries management program established by the FCMA have been exhaustively listed in Congressional findings and purposes in 16 U.S.C. § 1801. The Congress described these interests in this manner: [8]

(2) As a consequence of increased fishing pressure and because of the inadequacy of fishery conservation and management practices and controls (A) certain stocks of such fish have been overfished to the point where their survival is threatened, and (B) other such stocks have been so substantially reduced in number that they could become similarly threatened.

(3) Commercial and recreational fishing constitutes a major source of employment and contributes significantly to the economy of the Nation. Many coastal areas are dependent upon fishing and related activities, and their economies have been badly damaged by the overfishing of fishery resources at an ever-increasing rate over the past decade. The activities of massive foreign fishing fleets in waters adjacent to such coastal areas have contributed to such damage, interfered with domestic fishing efforts, and caused destruction of the fishing gear of United States fisherman.

(4) International fishery agreements have not been effective in preventing or terminating the overfishing of these valuable fishery resources. There is danger that irreversible effects from overfishing will take place before an effective international agreement on fishery manage-ment jurisdiction can be negotiated, signed, ratified, and implemented.

(5) Fishery resources are finite but renewable. If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

(6) A national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, and to realize the full potential of the Nation's fishery resources.

16 U.S.C. § 1801(a).

■ The authority to search without warrant is carefully limited to protect these substantial interests. It only applies to fishing vessels in the fishery conservation zone. *See* 18 U.S.C. § 1802(11). The scope of such a search is implicitly restricted to those areas of the ship which must be inspected to enforce the fishing regulations. The court assumes this would exclude living quarters and the crew's personal property where the expectation of privacy is entitled to more weight. The court has already noted its doubts about the fruits of such a search being used for purposes beyond the purview of the FCMA.

The fishing industry has been regulated by the federal government since 1793 when licenses were required for vessels engaged in cod and mackeral fishing. *See* 46 U.S.C. § 263.[9] The White Act of 1924 placed a system of detailed regulations on the fisheries of Alaska. 43 Stat. 464–67. The detailed regulation of fishing has become over the years so commonplace that persons engaged in that business could not entertain a justifiable expectation of being immune from reasonable inspection. *See* 16 U.S.C. §§ 776–776f (Sockeye or Pink Salmon Fishing); 16 U.S.C. §§ 772–772j (Northern Pacific Halibut Fishing); 16 U.S.C. §§ 781–85

---

**8.** The development of an American bottomfishing industry off Alaska is specifically mentioned twice in the statute. 16 U.S.C. § 1801(a)(7) and § 1801(b)(6).

**9.** *See, e. g., The Nymph,* 18 F.Cas. 509 (No. 10,388 (C.C.Me.1834); *United States v. The Reindeer,* 27 F.Cas. 758 (No. 16,145) (C.C.R.I. 1948); *United States v. The Paryntha Davis,* 27 F.Cas. 454 (No. 16003) (C.C.Me.1860).

(Sponges from Gulf of Mexico); 16 U.S.C. §§ 1100b–1100b–10 (Offshore Shrimp Fisheries), 16 U.S.C. §§ 916–916*l* (Whaling Convention Act); 16 U.S.C. § 951–61 (Tuna Conventions); Title 50 C.F.R. (Wildlife and Fisheries). The court holds that the federal interests present and the pervasive and historical regulation of fishing bring this case well within the exception to the warrant requirement defined in *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (federal gun control) and *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (federal alcohol regulation).

 The claimant contends that such a conclusion would be inconsistent with the Court's recent decision in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978). The Court in *Barlow's* clearly reaffirmed the *Biswell-Colonnade* exception but was unwilling to extend it to all industry engaged in interstate commerce. 436 U.S. at 313–14, 98 S.Ct. 1816. The Court held that warrantless searches under the Occupational Health and Safety Act were unconstitutional. In *Barlow's* there was no licensing system applied to a discreet industry but a wide statutory net placed over all of American industry. The *Barlow's* opinion indicates that the judiciary must be alert to any attempts by Congress to make warrantless searches the rule rather than the exception, so that it can truly be said that those who fall within the exception have been forewarned and have accepted the burdens which the special nature of their enterprise requires. The limitations placed upon the warrantless searches in this case make it highly unlikely that they present a threat to the values protected by the Fourth Amendment which concerned the Court in *Marshall v. Barlow's, Inc.* In summary, the U. S. Constitution is no bar to the warrantless searches authorized to protect the fisheries of the conservation zone established by the Fishery Conservation and Management Act of 1976. After the initial boarding and inspection, the court finds that the Coast Guard and other enforcement personnel had probable cause to justify the seizure and subsequent searches and that they were reasonable under the circumstances.

Accordingly, IT IS ORDERED:

THAT the claimant's motion to dismiss is denied.