UNITED STATES of America,
Plaintiff-Appellee,

v.

Edward J. RAUB, Defendant-Appellant.

No. 79–1619.

United States Court of Appeals,
Ninth Circuit.

May 22, 1980.

Irwin H. Schwartz, Seattle, Wash., on brief; John Tapp, Seattle, Wash., for defendant-appellant.

Judith Wegner, Edward J. Shawaker, Washington, D. C., John Merkel, Seattle, Wash., on brief; James J. Tonkovicz, Trial Atty., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

* The Honorable Homer Thornberry, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.

1. Regulations promulgated under the Sockeye Salmon or Pink Salmon Fishing Act of 1947, 16 U.S.C. §§ 776–776f, state:

> No person shall fish for sockeye or pink salmon with gill nets in [Convention waters of the United States under International Pacific Salmon Fishing Commission jurisdiction]:
>
> (a) From the 16th day of July, 1978 to the 22nd day of July, 1978.

50 C.F.R. § 371.9, Appendix A, para. 2(2)(a) (1978).

Before THORNBERRY,* CHOY and PREGERSON, Circuit Judges.

CHOY, Circuit Judge:

Edward J. Raub was convicted of violating federal fishing regulations that limited salmon fishing in Puget Sound. At his trial before a U. S. magistrate, Raub moved to suppress evidence seized from his boat on the ground that the warrantless stop and boarding of his boat by federal agents violated the fourth amendment. The magistrate found that no fourth amendment "search" had occurred and denied the motion to suppress. The district court affirmed Raub's conviction, holding that the magistrate did not clearly err in finding that a search had not occurred. We hold that this inspection stop was a search within the scope of the fourth amendment, but affirm the conviction on the ground that the search falls within the *Biswell-Colonnade* administrative search exception to the warrant requirement.

## I. STATEMENT OF FACTS

On July 17, 1978, at approximately 6 p. m., Raub was fishing in the waters to the north of Partridge Point, Washington. At that time and place, federal regulations prohibited all persons, except Indians exercising fishing rights under the Point Elliott Treaty,[1] from fishing for sockeye salmon

The regulations exempt treaty Indians "exercising treaty-secured fishing rights at the tribes' usual and accustomed fishing places." *Id.* § 371.2. There are separate regulations governing treaty fishing by Indians. Those regulations allow gill net fishing in Convention waters between July 16 and July 22, 1978. 25 C.F.R. § 256.17(b) (1979).

The treaty governing the area where Raub was found fishing is the Point Elliott Treaty, Jan. 22, 1855, 12 Stat. 927. This treaty allows members of certain Indian tribes to fish in this area of Puget Sound. Raub is not a member of any of these tribes.

with gill nets.[2] 50 C.F.R. § 371.9, Appendix A, para. 2(2)(a) (1978); *id.* § 371.2.

Agent Hilton, an officer of the National Marine Fisheries Service, entered the area aboard a Coast Guard vessel on a routine patrol for purposes of enforcing federal fishing regulations and district court orders protecting Indian treaty fishing rights.[3] Both the statute under which the regulations were promulgated and the court orders authorized enforcement agents to board vessels without warrants to check identification and to ascertain whether fishermen were in compliance with the applicable fishing regulations.[4] Operators of two authorized Indian boats told Agent Hilton that Raub's vessel, the Dorla, was unfamiliar to them. Based on this information and Hilton's experience that unauthorized boats often slip in among treaty boats, Hilton approached the Dorla. As he neared the vessel, he noticed a gill net in the water and a placard indicating that the boat was authorized to fish in the Point Elliott Treaty area and identifying Raub as a Point Elliott Treaty Indian.

Hilton told Raub that he would like to come aboard. Raub shrugged or commented; there was nothing negative in his response. Hilton boarded the Dorla and asked to check the passengers' Bureau of Indian Affairs identification cards. Raub's companion told Hilton that Raub was the only person fishing from the vessel. Hilton later saw this companion cleaning a sockeye salmon.

Upon checking Raub's identification, Hilton discovered that Raub was a member of the Makah Tribe, a tribe of Indians not protected by the Point Elliott Treaty. Confronted with the discrepancy between the placard displayed on the Dorla and the identity card, Raub admitted that the placard on the window was not his.

Hilton then left the vessel to contact his area office. When he returned and reboarded the Dorla at about 8 p.m. to issue Raub a citation, Hilton seized one of the sockeye salmon caught by Raub and a swatch of Raub's gill net.

After consenting to trial by a U. S. magistrate, Raub moved to suppress the evidence seized. The motion was denied and Raub was convicted. The district court affirmed the decision and this appeal follows.

## II. DISCUSSION

### A. The Boarding was a "Search" Within the Fourth Amendment

The magistrate and district court held, and the Government argues, that the boarding of Raub's boat for the purpose of checking his identification was not a "search" within the fourth amendment. We disagree.

To support its contention, the Government cites the Sockeye Salmon or Pink Salmon Fishing Act of 1947, § 6(d), 16 U.S.C. § 776d(d), which authorizes warrantless boardings and the case of *United States v. Olander*, 584 F.2d 876 (9th Cir. 1978), which held that boarding a vessel to serve process is not a search. Federal statutes are subject to constitutional limitations. *Almeida-Sanchez v. United States*, 413 U.S.

---

2. A gill net is a flat net suspended vertically in the water, having meshes that allow the head of a fish to pass, but catches its gill covers as it seeks to withdraw. Webster's Third New International Dictionary 957 (Merriam-Webster 1971).

3. The orders referred to were issued by the federal district court in *United States v. Washington*, 459 F.Supp. 1020 (W.D.Wash.), *aff'd*

sub nom. *Puget Sound Gillnetters Ass'n v. United States District Court*, 573 F.2d 1123 (9th Cir. 1978), *vacated and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979).

4. 16 U.S.C. § 776d(d); *United States v. Washington*, 459 F.Supp. at 1130.

266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Odneal*, 565 F.2d 598, 601 (9th Cir. 1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978). Therefore, if a warrant requirement is imposed by the fourth amendment, no statute can dispose of it.

■ The *Olander* rule does not apply to investigatory stops. We held in *Olander* that boarding a boat to serve civil process was materially different from boarding to search:

> [M]erely boarding to serve process is neither a search nor a seizure . . . . Coming onto the deck of the boats is like coming onto a lot where a house is situated, or onto the porch or landing of the house. Nothing in the Fourth Amendment prohibits handing process to a man, in a peaceable manner, on his property, including his boat.

584 F.2d at 888.

■ Although boarding vessels to serve process falls outside the protection of the fourth amendment, warrantless boarding of vessels for investigation and inspection is within the protection of the fourth amendment. *See United States v. Odneal*, 565 F.2d at 601 (investigatory stop of vessel by Coast Guard subject to fourth amendment limitations); *United States v. Piner*, 608 F.2d 358 (9th Cir. 1979) (random safety inspection stop and boarding of vessel within scope of fourth amendment). Agent Hilton's boarding of the Dorla to inspect and investigate constituted a search.

### B. *The Search was Within the Biswell-Colonnade Exception*

■ The Supreme Court has held that the fourth amendment requires a warrant for administrative searches of private property except in "certain carefully defined classes of cases." *Camara v. Municipal Court*, 387 U.S. 523, 528–29, 87 S.Ct. 1727, 1731, 18 L.Ed.2d 930 (1967). One of the recognized exceptions to the warrant requirement is for administrative searches of enterprises that traditionally have been closely regulated. *See United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970).

In *Colonnade*, the Court held that an establishment licensed to sell liquor could be searched by an inspector without a warrant. Pointing to the long history of close government supervision and inspection of the liquor industry, the Court found that Congress had broad authority to determine standards of reasonableness for searches and seizures in enforcement of liquor regulations. 397 U.S. at 77, 90 S.Ct. at 777.

In *Biswell*, the Court held that a treasury agent may make a warrantless search of the premises of a licensed gun dealer. Although firearms traffic did not have as long a history of government control as the liquor industry, the Court found that an important federal interest in preventing violent crime was at stake and that close scrutiny through inspection was a crucial part of the regulatory scheme. 406 U.S. at 315, 92 S.Ct. at 1596. The Court recognized that a dealer engaged in such a pervasively regulated business did so with the knowledge that his business records and inventory would be subject to inspection. Furthermore, the statute defining the inspector's authority limited the threat to privacy and possibility of abuse. *Id.* at 316, 92 S.Ct. at 1596. Such interest, knowledge, and precautions made inspection without a warrant not unreasonable under the fourth amendment.

In *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313, 98 S.Ct. 1816, 1820, 56 L.Ed.2d 305 (1978), the Supreme Court clarified the administrative search exception. The distinguishing element giving rise to the exception in pervasively regulated *Biswell* businesses or traditionally regulated *Colonnade* industries, said the Court, is the awareness and expectation by a person entering such a business that he is subjecting himself to government supervision and regulation.

Under these conditions, no reasonable expectation of privacy can exist for the proprietor of the enterprise. *Id.* Citizens "engaged in such federally licensed and regulated enterprises [must] accept the burdens as well as the benefits of their trade. . . . The businessman in a regulated industry in effect consents to the restrictions placed upon him." *Almeida-Sanchez v. United States*, 413 U.S. at 271, 93 S.Ct. at 2538.

Raub argues that his business does not fall within the *Biswell-Colonnade* exception because federal regulation of salmon fishing is a recent development compared to regulation of the industries where warrantless inspections have been allowed. In addition, he asserts that enforcement officers are allowed unfettered discretion because there is little statutory limitation.

■ Commercial fishing has a long history of being a closely regulated industry.[5] *See United States v. Tsuda Maru*, 470 F.Supp. 1223, 1229 (D.Alaska 1979).[6] The statute authorizing federal government regulation of salmon fishing in Puget Sound dates back to 1947, and implements a 1930 international convention. Sockeye Salmon or Pink Salmon Fishing Act of 1947, 16 U.S.C. §§ 776–776f. The treaty between the United States and Indian tribes granting off-reservation fishing rights in Puget Sound to Indians dates back to 1855. Point Elliott Treaty, Jan. 22, 1855, 12 Stat. 927. Under the statute and the treaty, the federal government has promulgated highly detailed regulations which specify when, where, and how salmon may be fished. *See* 50 C.F.R. §§ 371.1–.9 (1978); 25 C.F.R. §§ 256.1–.21 (1979). These regulations require that treaty Indians carry identification while fishing. 25 C.F.R. § 256.14(a).

The statute and regulations promote salmon conservation, an important federal interest. This interest has been expressed by the government in a convention between the United States and Canada. Convention for the Protection of the Sockeye Salmon Fishery, May 26, 1930, United States-Canada, 50 Stat. 1355. Both countries agreed to promote the protection, preservation, and extension of the sockeye and pink salmon fisheries of the Fraser River system. The convention described the waters where salmon fishing would be restricted and created the International Pacific Salmon Fisheries Commission. The Sockeye Salmon or Pink Salmon Fishing Act of 1947 was enacted to further this interest by enforcing the provisions of the convention and the regulations of the Commission. S.Rep. No. 302, 85th Cong., 1st Sess., *reprinted in* [1957] U.S.Code Cong. & Admin.News, pp. 1310, 1310–11.

---

**5.** Federal regulation of the fishing industry dates back to a 1793 federal license requirement for fishing vessels. Act of Feb. 18, 1793, 1 Stat. 305. Pacific salmon fisheries have been substantially supervised by the federal government since 1896. Act of June 9, 1896, 29 Stat. 317 (an act protecting salmon fisheries in Alaska). *See generally* Northern Pacific Halibut Act of 1937, 50 Stat. 325, 16 U.S.C. §§ 772–772j; Act of Aug. 4, 1949, 38 Stat. 692, 16 U.S.C. §§ 781–786 (sponges from Gulf of Mexico or Straits of Florida); Whaling Convention Act of 1950, 64 Stat. 421, 16 U.S.C. §§ 916–916*l*; Tuna Conventions Act of 1950, 64 Stat. 777, 16 U.S.C. §§ 951–961; Northwest Atlantic Fisheries Act of 1950, 64 Stat. 1067, 16 U.S.C. §§ 981–991; North Pacific Fisheries Act of 1954, 68 Stat. 698, 16 U.S.C. §§ 1021–1032; Offshore Shrimp Fisheries Act of 1973, 87 Stat. 1061, 16 U.S.C. §§ 1100b to 1100b–10; Fishery Conservation Management Act of 1976, 90 Stat. 331, 16 U.S.C. §§ 1801–1882. *See* note 7 *infra.*

**6.** In *Tsuda Maru*, a case quite similar to the one at bar, the court held that inspections carried out under a federal fisheries management program came within the *Biswell-Colonnade* exception. The issue presented in *Tsuda Maru* was whether a warrantless search of a Japanese vessel by National Fisheries Service agents in a fishery conservation zone violated the fourth amendment. The district court found that there were important federal interests in protecting fish resources, that the fishing industry had been heavily and historically regulated, and that the authority to search was limited to protecting federal interests and did not extend to areas of a vessel where a reasonable expectation of privacy existed. *Id.* at 1228–30. It therefore held that "the U. S. Constitution is no bar to the warrantless searches authorized . . . by the Fishery Conservation and Management Act of 1976." *Id.* at 1230. *See* note 7 *infra.*

The Point Elliott Treaty was one of a series of treaties negotiated between the United States and the Indian tribes to extinguish Indian land claims in exchange for, among other things, the preservation of traditional Indian fishing rights. *See Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 660, 99 S.Ct. 3055, 3062, 61 L.Ed.2d 823 (1979). The United States has an important interest in honoring this compact with the Indians. *See generally id.* The regulations serve this important federal interest by implementing the terms of the Point Elliott Treaty.

Under the Sockeye Salmon or Pink Salmon Fishing Act of 1947, the authority to search without a warrant is carefully limited to searches that protect the federal interest in salmon conservation. The authority to search applies only to fishing vessels within convention waters, and then only when there is "reasonable cause" to believe a violation of the convention or of the statute and regulations may be occurring. 16 U.S.C. § 776d(d). Inspection of licenses is also authorized and limited to vessels and persons fishing in convention waters. *Id.* § 776d(f).

Searches under Indian treaty-rights regulations are limited to the purpose of identifying Indian fishermen and their assistants by valid treaty Indian identification cards. 25 C.F.R. § 256.14(c).

Moreover, in both sets of regulations, the scope of the search or inspection is implicitly restricted to those areas of the ship which must be inspected to enforce the fishing regulations. *Cf. United States v. Tsuda Maru*, 470 F.Supp. at 1229 (so held under Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1882). Thus, the restriction of enforcement officers' search authority limits the possibility of abuse.

The long history of detailed regulation of commercial fishing in the Puget Sound area implies that there is no reasonable expectation of privacy regarding identification stops of commercial fishermen in that area. Recent publicity about the federal regulation of fishing in the Puget Sound area provides a further basis for this conclusion. The federal district court has enforced the regulatory scheme dealing with Indian treaty fishing rights through well-publicized orders. *See United States v. Washington*, 459 F.Supp. 1020 (W.D.Wash.), *aff'd sub nom. Puget Sound Gillnetters Association v. United States District Court*, 573 F.2d 1123 (9th Cir. 1978), *vacated and remanded sub nom. Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *United States v. Olander*, 584 F.2d 876 (9th Cir. 1978). Such notoriety would make any person, Indian or non-Indian, who chooses to enter the commercial fishing business in the Puget Sound area aware of the numerous and detailed federal regulations, and cause him to expect identification stops of his vessel to be made by law enforcement officers.

In this case, the facts show that Raub was aware of the federal regulations governing salmon fishing in that area. He knew that only certain tribes of Indians were allowed to fish there at that time. This was evidenced by the fact that a placard, required by law, identifying him as an Indian allowed to fish in those particular waters, was displayed on his boat. Moreover, Raub was aware that he had to carry his Indian identification card with him and show it to an enforcement officer. He had an identification card with him and presented it to Agent Hilton upon request.

■ Agent Hilton did not exceed his authority under the regulations governing fishing in that area. He requested permission to board the Dorla and asked to see the identification of the fishermen. He did not search the vessel, entering the wheelhouse solely to examine Raub's identification. At that time, Hilton saw, in plain view, a sockeye salmon being cleaned. Thus, Hilton's

actions were within his limited authority under the regulations. His observations gave him probable cause to support the seizure of the fish and swatch of net.

## III. *CONCLUSION*

The historical and pervasive regulation of the salmon fishing industry in the Puget Sound area, the important federal interests at stake, and the limited possibility of abuse bring this case within the *Biswell-Colonnade* exception to the warrant requirement. Therefore, the fourth amendment does not bar the warrantless searches authorized by the Sockeye Salmon or Pink Salmon Fishing Act of 1947 and the regulations implementing the Point Elliott Treaty.[7]

Raub's conviction is AFFIRMED.

---

**7.** Although we note the pervasive federal regulation of the commercial fishing industry in general as background to the regulation of salmon fishing in Puget Sound specifically, *see* note 5 *supra*, we have no occasion in this case to address the broad question whether in the commercial fishing industry in general investigatory stops are within the *Biswell-Colonnade* exception to the warrant requirement. Rather, our holding is confined to investigatory stops pursuant to the Sockeye Salmon or Pink Salmon Fishing Act of 1947 and the regulations implementing the Point Elliott Treaty.

The district court in *Tsuda Maru* states in dictum that "[t]he detailed regulation of fishing has become over the years so commonplace that persons engaged in that business could not entertain a justifiable expectation of being immune from reasonable inspection." 470 F.Supp. at 1229. Its holding, however, is expressly confined to "the warrantless searches authorized . . . by the Fishery Conservation and Management Act of 1976 [, 16 U.S.C. §§ 1801–1882]." Id. at 1230.