177 N.J. Super. 304 (1981)
426 A.2d 534
IN THE MATTER OF THE STATE DEPARTMENT OF ENVIRONMENTAL PROTECTION, DIVISION OF WATER RESOURCES OF THE STATE OF NEW JERSEY, CERTIFICATION APPROVING APPLICATION OF VINELAND CHEMICAL COMPANY, INC. FOR PERMISSION TO CONSTRUCT AND OPERATE AN INDUSTRIAL WASTE TREATMENT FACILITY.
Superior Court of New Jersey, Appellate Division.
Argued October 7, 1980.
Decided February 9, 1981.
*306 Before Judges MATTHEWS, MORGAN and MORTON I. GREENBERG.
Franklin J. Riesenburger argued the cause for appellant Vineland Chemical Co., Inc. (Greenblatt, Greenblatt & Riesenburger, attorneys).
Paul H. Schneider, Deputy Attorney General, argued the cause for respondent Department of Environmental Protection (John J. Degnan, Attorney General, attorney; Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
This is an appeal by Vineland Chemical Co., Inc. from a decision of the Department of Environmental Protection, Division of Water Resources (DEP), imposing certain conditions on Vineland's approved permit to construct and operate an industrial wastewater treatment facility.
On December 11, 1978 Vineland submitted to DEP its permit application for construction of a proposed facility whose purpose would be to treat industrial wastewater containing arsenic in order to reduce the arsenic contamination to acceptable levels prior to discharge into the environment. By letter dated January 30, 1979, DEP issued certificate SID-10-78-54 approving Vineland's application for the construction and operation of an *307 industrial waste treatment facility. However, Vineland's permit was granted subject to certain conditions. Two of those conditions were that a licensed operator should be in charge of the wastewater treatment plant and that the DEP should have the right of entry to all premises for the purposes of inspection, sampling, copying or photographing.
On February 16, 1979 DEP sent Vineland a letter detailing the statutes, rules and regulations relative to the licensing of operators and the appropriate applications for licensing examinations. On March 5, 1979 Vineland's counsel appealed from a variety of DEP's conditions, including the licensing of operators and the right to enter Vineland's premises. By letter dated April 20, 1979 DEP agreed to modify several of its conditions. It refused, however, to modify the licensing of operators condition, contending that pursuant to N.J.S.A. 58:11-18.10(b) Vineland's proposed facility was a "public sewage treatment plant" and, therefore, Vineland was required to employ a licensed operator. DEP also refused to modify its condition regarding right of entry, noting it was empowered to enter Vineland's premises pursuant to either N.J.S.A. 58:10A-6 or N.J.S.A. 13:1D-9(d).
Vineland again appealed by letter dated April 30, 1979 to DEP, urging that Vineland's facility did not involve a public water supply system, public water treatment plant or public sewage plant and accordingly did not fall under N.J.S.A. 58:11-18.10 et seq., and also urging that DEP's alleged "searching authority" pursuant to N.J.S.A. 58:10A-6 does not properly reflect the DEP Commissioner's power, and that N.J.S.A. 13:1D-9(d) is unconstitutional. On May 10, 1979 DEP responded that it continued to require as conditions the licensing of plant operators and the right to search "all premises in which a discharge source is or might be located or in which monitoring equipment or records required by a permit are kept, for purposes of inspection, sampling, copying or photographing." The quoted language regarding DEP's right to search Vineland's premises is theoretically a modification of the right of entry *308 because it follows exactly the statutory language of N.J.S.A. 58:10A-6(g).
As amended by letter dated May 10, 1979, the permit condition regarding DEP's right to enter Vineland's premises reads:
Pursuant to [N.J.S.A.] 58:10A-6, the Department shall have the right of entry to all premises in which a discharge source is or might be located or in which monitoring equipment or records required by a permit are kept, for purposes of inspection, sampling, copying or photographing.
Vineland's argument with respect to DEP's right of entry onto its premises is that both of the statutory sources from which DEP derives its authority to search are unconstitutional in light of Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).
N.J.S.A. 13:1D-9(d) enumerates the powers of DEP with regard to conservation and protection of the State's resources and provides:
The department shall formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State. The department shall in addition to the powers and duties vested in it by this act or by any other law have the power to:
........
d. Enter and inspect any building or place for the purpose of investigating an actual or suspected source of pollution of the environment and ascertaining compliance or noncompliance with any code, rules and regulations of the department. Any information relating to secret processes concerning methods of manufacture or production obtained in the course of such inspection, investigation or determination, shall be kept confidential and shall not be admissible in evidence in any court or in any other proceeding except before the department as herein defined. If samples are taken for analysis, a duplicate of the analytical report shall be furnished promptly to the person suspected of causing pollution of the environment....
N.J.S.A. 58:10A-6, the provision dealing with the regulation of discharges of pollutants, authorization of permits and DEP's right of entry, provides in pertinent part:
........
b. It shall be unlawful for any person to build, install, modify or operate any facility for the collection, treatment or discharge of any pollutant, except after approval by the department pursuant to regulations adopted by the commissioner.
........

*309 g. The commissioner shall have a right of entry to all premises in which a discharge source is or might be located or in which monitoring equipment or records required by a permit are kept, for purposes of inspection, sampling, copying or photographing. [Emphasis supplied]
DEP contends[1] that the administrative warrant requirement of Barlow's does not apply in situations involving activities subject to pervasive or long-standing governmental regulation, because one engaging in such a closely regulated activity is regarded as having "voluntarily chosen to subject himself to a full arsenal of government regulation," and thus enjoys no reasonable expectation of privacy. Barlow's, 436 U.S. at 313, 98 S.Ct. at 1821.
The "long standing governmental regulation" exception to the warrant requirement arises out of Colonnade Catering Corp. v. U.S., 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). There, the warrantless search involved inspection of a catering establishment's liquor supply to investigate possible violations of the federal excise tax law. A portion of the holding validating the search recognized that Congress had broad authority in designing powers of inspection under the liquor laws. Id. at 76, 90 S.Ct. at 776. A primary focus of the court's decision in this regard was the long history of the regulation of the liquor industry dating back to pre-Fourth Amendment days. Here, unlike the liquor industry, it cannot be said that regulation of *310 the chemical or industrial wastewater treatment industry has had a long history of governmental regulation.
The "pervasive government regulation" exception to the warrant requirement, arising out of U.S. v. Biswell, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), however, does, we believe, aid DEP here. In Biswell the warrantless search was of the storeroom of a pawnshop operator who was federally licensed to deal in firearms. The search, which turned up untaxed firearms, was conducted by a federal agent who represented that he did not need a warrant to search, pursuant to the Gun Control Act of 1968 which authorized treasury agents to enter the premises of any firearms dealer during business hours for the purpose of inspecting or examining any records or documents required to be kept, and any firearms or ammunition stored on the premises. The court stated, in the context of a regulatory inspection system of business premises, that the legality of the search depends upon the authority of a valid statute. The court noted that although firearms regulation is not as deeply rooted in history as liquor regulation, close scrutiny is of central importance in federal crime prevention efforts, and that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy, since:
... a dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection.... [at 317, 92 S.Ct. at 1596; emphasis supplied]
In Almeida-Sanchez v. U.S., 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), the court reversed a conviction for possession of marijuana found in an automobile, finding the warrantless auto search conducted by immigration officials to be a violation of the Fourth Amendment. Pertinent to the present appeal are the court's comments on the government's reliance on administrative inspection cases. Distinguishing between Biswell and Colonnade and the case before it the court said:
A central difference between those cases and this one is that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, whereas the petitioner here was not *311 engaged in any regulated or licensed business. The businessman in a regulated industry in effect consents to the restrictions placed upon him. [at 271, 93 S.Ct. at 2538]
Since this line of Supreme Court decisions, several administrative search situations have arisen wherein a warrantless search was permitted. In U.S. v. Tsuda Maru, 470 F. Supp. 1223 (D.Alaska 1979), a warrantless inspection of a foreign fishing vessel was conducted by the Coast Guard based upon a permit issued to the vessel pursuant to the Fishery Conservation and Management Act (FCMA) of 1976 (16 U.S.C.A. §§ 1801-22). The claimant moved to dismiss the government's complaint for forfeiture of the vessel (instituted due to FCMA violations) based upon an impermissible warrantless search of the vessel. For the purposes of the claimant's motion, the trial judge assumed no probable cause existed and noted, accordingly, that for the warrantless inspection to be valid, authorization must be found in the statutory scheme and that such authorization must be consistent with the Fourth Amendment. Id. at 1227. In this regard the court found authorization to board, search or inspect at any time in the statute, that regulations were promulgated echoing this statutory authority (50 C.F.R. § 611.7(a)(4)), and that the within vessel's permit to fish incorporated said regulations. Id. at 1227-1228. The court cited Biswell and Colonnade and noted that Congress had enumerated important federal and international interests in the enforcement of the fisheries management program, recognized the restricted scope of this inspection power, and emphasized the facts that the fishing industry had been federally regulated since 1793, and that in light of detailed regulation over the years, "persons engaged in that business could not entertain a justifiable expectation of being immune from reasonable inspection," in upholding the warrantless inspection. Id. at 1229.
As in the present appeal, the claimant in Tsuda Maru relied upon Marshall v. Barlow's, Inc. The court in Tsuda Maru distinguished Barlow's, noting that in Barlow's there was no licensing system applied to a discrete industry but a wide *312 statutory net applied to all industry. After stating that courts should be alert to congressional attempts to make warrantless searches the rule rather than the exception, so that "those who fall within the exception have been forewarned and have accepted the burdens which the special nature of their enterprise requires," the Tsuda Maru court found that the limits placed on warrantless inspections, on the facts before it, made it highly unlikely that Fourth Amendment values were threatened. 470 F. Supp. at 1230.
In People v. Firstenberg, 92 Cal. App.3d 570, 155 Cal. Rptr. 80 (D.Ct.App. 1979), defendant, licensee of a skilled nursing facility, was convicted of commingling patients' funds with his own. The evidence implicating defendant was obtained by a county health services inspector who visited defendant's facility to verify regulatory compliance. His review of the records revealed financial misdealings that eventually led to defendant's conviction. Defendant's appeal was based on Marshall v. Barlow's, Inc. in that he alleged that a warrantless search of health care facilities for purposes of securing compliance with licensing regulations is violative of constitutional privacy guarantees.
After tracing the development of administrative warrantless searches through Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), and Colonnade and Biswell, the Firstenberg court stated:
It is thus clear there are two lines of cases and two sets of rules governing administrative searches. The first of these deals with general regulatory schemes  whether federal, state or local  which apply to all residences or all structures or all employees within the particular jurisdiction. Camara and See fall within this category, as does Marshall. The second line of cases involves regulatory legislation governing specific licensed industries. Colonnade and Biswell fall within this category. Appellant's situation falls within this second line of cases and must be evaluated accordingly." [92 Cal. App.3d at 578-579, 155 Cal. Rptr. 80]
The Firstenberg court also noted that while the California health care industry lacked the lengthy regulatory history of liquor as in Colonnade, it has for some years been pervasively *313 regulated, a license being required to operate such a facility, and the licensee is subject to various administrative regulations promulgated in furtherance of the legislative scheme. 92 Cal. App.3d at 579, 155 Cal. Rptr. 80. Thus, the court said, "The licensee is on notice that compliance with the statutes and regulations is a condition of his doing business." Ibid.
Citing a previous California decision, People v. White, 259 Cal. App.2d Supp. 936, 65 Cal. Rptr. 923 (App.Dep't/Super.Ct. 1968), which held there was a fundamental premise that acceptance of a license to operate a hospital constitutes implied consent to such supervision and inspection as is required by the licensing statute involved, the Firstenberg court reached the conclusion that:
Regardless of whether the justification advanced is the legal fiction of implied consent as in White, or Biswell's judicial circumscription on what expectations of privacy are reasonable for a business licensee, the end result is the same. Acceptance of the license carries with it the burden of submission to inspections which reasonably further enforcement of the regulatory scheme. [92 Cal. App.3d at 581, 155 Cal. Rptr. 80]
The key issue before us is whether Vineland's activity pertains to a pervasively regulated business and the corresponding degree to which it constitutes an exception to the warrant requirement. To a great extent, resolution of his issue becomes a question of characterization of Vineland's activity. Realistically, we believe Vineland's activity can be characterized in a variety of ways capable of supporting different results. For example, we could view Vineland's activity as related solely to the chemical industry, a business not pervasively regulated in this State, or we could find Vineland's specific activity in this appeal to involve construction and operation of a wastewater treatment plant, itself only colorably a pervasively regulated business. However, we choose to view Vineland's activity in the present appeal as being integrally related to the issue of water pollution and conservation of resources, which is an activity extensively regulated in this State. We believe the latter approach is most appropriate, and one capable of upholding the statutory scheme and the permit condition.
*314 Regulation of water pollution in this State dates back at least as early as 1876[2] when the State Legislature enacted a provision punishing any person who in any way polluted waters in the State used for distribution to the public. L. 1876, c. 152, amended by L. 1880, c. 52. In 1897 legislation was enacted prohibiting the willful pollution of the Passaic River. L. 1897, c. 35. In L. 1899, c. 41, amended by L. 1909, c. 151 and L. 1918, c. 229, extensive and detailed legislation was enacted "to secure the purity of the public supplies of potable waters in this state." In 1910 the Legislature acted to prohibit the discharge of sewage and other polluting matter into all fresh water. L. 1910, c. 215. The DEP's brief also points to 1899 federal legislation prohibiting the deposit of refuse in any navigable water or tributary. 33 U.S.C.A. § 407.
Current state regulation of water pollution can be found in the detailed Water Pollution Control Act. N.J.S.A. 58:10A-1 et seq.; L. 1977, c. 74. That act contains the statutory authorization under which DEP conditioned Vineland's permit upon a right to enter Vineland's premises under appropriate conditions. 58:10A-6(g). The act also includes legislative findings and declaration detailing the serious nature of water pollution problems, and provides a detailed statutory framework for the regulation of discharges of pollutants. The State Water Pollution Control Act also refers to the Federal Water Pollution Control Act, 33 U.S.C.A. § 1251 et seq., and finds that the federal act creates a permit system, that permits may be issued by the state or federal government and that
It is in the interest of the people of this State to minimize direct regulation by the Federal Government of wastewater discharges by enacting legislation which will continue and extend the powers and responsibilities of the Department of Environmental Protection for administering the State's water pollution control program, so that the State may be enabled to implement the permit system required by the Federal Act. [N.J.S.A. 58:10A-2]
*315 Significantly, 33 U.S.C.A. § 1318(a)(B) provides that whenever required to carry out the objectives of the Federal Water Pollution Control Act, 33 U.S.C.A. § 1251 et seq., the Administrator of the Environmental Protection Agency:
... (i) shall have a right of entry to ... any premises in which an effluent source is located or in which any records required to be maintained ... are located....
Further state regulation can be found in the Conservation and Development Act. Specifically, N.J.S.A. 13:1D-9 mandates that DEP formulate comprehensive policies to promote the protection of the environment and to prevent the pollution of the environment, and empowers DEP to enter and inspect any place for the purpose of investigating a source of environmental pollution and ascertaining compliance or noncompliance with departmental regulations. N.J.S.A. 13:1D-9 d. A long list of DEP powers related to pollution control and facilities for pollution control is enumerated in N.J.S.A. 13:1D-9.
Moreover, the specific activity of water supply treatment plants is also extensively regulated in this State. N.J.S.A. 58:11-18.10 et seq.
Thus, it is clear that Vineland's activity fits under the pervasive government regulation (Biswell) exception to the administrative search warrant requirement and may even fit the long-standing, historical government regulation exception (Colonnade). Because it falls within these exceptions to the warrant requirement, N.J.S.A. 58:10A-6 does not violate Vineland's Fourth Amendment rights and DEP may as a condition to permit approval require Vineland to submit the warrantless inspection provision provided for in the permit as modified.
We also note that what is actually involved here is the discharge of pollutants into the environment, an activity which we believe is clearly subject to the regulatory powers of DEP. While control of such activity is obvious, we also understand that regulation must be within constitutional guidelines. We find them to be met here.
*316 The permit provisions requiring that the facility have a licensed operator are clearly authorized by regulations which implement the Water Pollution Control Act, N.J.S.A. 58:10A-1 et seq. In enacting the Water Pollution Control Act the Legislature acted to protect the public health and the environment through a policy of restoring, enhancing and maintaining water quality. N.J.S.A. 58:10A-2. Specifically, N.J.S.A. 58:10A-6b states:
It shall be unlawful for any person to build, install, modify, or operate any facility for the collection, treatment or discharge of any pollutant, except after approval by the department pursuant to regulations adopted by the commissioner.
Thus, the act requires that the grant of treatment works approval be determined pursuant to administrative regulations. In addition, N.J.S.A. 58:10A-4 grants DEP broad authority to promulgate regulations to implement the Water Pollution Control Act.
DEP has exercised this authority by adopting regulations entitled, "Approval of Facilities for Prevention, Collection, Treatment or Discharge of Pollutants," N.J.A.C. 7:14-2.1 et seq. By express provision of these regulations, DEP, in its grant of treatment works approval, "may require the applicant to meet special conditions for the operation of treatment works" where such conditions are "necessary for the prevention of pollution or protection of the environment." N.J.A.C. 7:14-2.23(c). As stated in the permit, a licensed operator is required because DEP, acting pursuant to N.J.A.C. 7:14-2.23, has determined this to be necessary to prevent pollution or protect the environment. Furthermore, as observed by appellant's own engineer in documents submitted by appellant in support of its application, this requirement is routinely applied with respect to all applications for permits pursuant to N.J.A.C. 7:14-2.1 et seq.
Appellant has never questioned the factual basis for DEP's determination that the protection of the environment or the prevention of pollution requires that the treatment works have a licensed operator. Instead, appellant has limited its appeal to *317 the question of whether DEP has the legal authority to impose such a requirement. Indeed, it would be difficult for appellant to challenge the factual basis for DEP's determination since the engineer's report which appellant submitted in support of its application expressly states that effective operation of the treatment works depends upon "the experience, judgment and observation of trained personnel." Since the purpose of the treatment facility is to lessen the level of arsenic in appellant's wastewater prior to discharge into the environment, improper operation would result in unacceptable levels of pollution and environmental degradation. Thus, DEP correctly concluded that in order to insure that the operator of the facility has the training, experience and judgment necessary to run the facility properly, he or she must meet the department's licensing standards.
Therefore, independent of the applicability of other statutes to Vineland's treatment works, the permit provisions requiring that appellant's treatment works have a licensed operator are valid pursuant to the Water Pollution Control Act and its implementing regulations, specifically N.J.S.A. 58:10A-6; N.J.A.C. 7:14-2.23(c).
By the terms of the permit, DEP relies upon N.J.S.A. 58:11-18.12 as an alternate basis for support for the requirement that appellant's industrial waste treatment facility have a licensed operator. N.J.S.A. 58:11-18.12 requires that the operator or superintendent of a public sewage treatment plant be licensed by DEP[3] pursuant to N.J.S.A. 58:11-18.10 et seq. Accordingly, this statute is applicable to appellant's facility if it is a "public sewage treatment plant" within the meaning of the statute. The relevant definition, found in N.J.S.A. 58:11-18.10(b) states:
"Public sewage treatment plant" means any structure or structures by means of which domestic wastes are subjected to any artificial process in order to *318 remove or so alter constituents as to render the wastes less offensive or dangerous to the public health, comfort or property of any of the inhabitants of this State before the discharge of the plant effluent into any of the waters of this State; this definition includes plants for the treatment of industrial wastes as well as a combination of domestic and industrial wastes.
In determining whether appellant's facility falls within this definition it should be observed that the Legislature has expressly provided that the statute should be given liberal interpretation. N.J.S.A. 58:11-18.22 provides in relevant part:
The object and design of this act [N.J.S.A. 58:11-18.10 et seq.] being the protection and preservation of public health, safety and welfare, this act shall be liberally construed....
Furthermore, it is well recognized that statutes which seek to protect the public health and welfare through the control of water pollution are entitled to a liberal construction so that their beneficial objective may be accomplished. Lom-Ran Corp. v. Environmental Protection Dep't, 163 N.J. Super. 376 (App.Div. 1978).
N.J.S.A. 58:11-18.10(b) expressly states that a public sewage treatment plant includes "any structure" as described therein (emphasis supplied). The final clause in N.J.S.A. 58:11-18.10(b) expressly provides that the definition "includes plants for the treatment of industrial wastes as well as a combination of domestic and industrial wastes." There is no dispute that the facility in question is a structure for the treatment of industrial wastes. Thus, giving the statute the liberal interpretation mandated by the Legislature, it is clear that appellant's facility is a "public sewage treatment plant" within the meaning of the statute.
Appellant argues that since the Vineland facility will not serve the general public and charge a tariff, it therefore is not a "public" sewage treatment plant. Not only does appellant cite no case law, legislative history or other authority in support of its position but, as noted above, appellant's interpretation is contrary to the express statutory definition. The threat to the public health and welfare through water pollution caused by improper operation of a treatment facility is the same whether *319 the facility charges a tariff to treat the wastes of another or, as here, the facility is owned by the producer of the wastes it will treat. Thus, in order to accomplish the stated legislative objective of protecting the public health, the statute must be construed to include either type of facility within the definition of public sewage treatment plant. See N.J.S.A. 58:11-18.22; Seatrain Lines, Inc. v. Medina, 39 N.J. 222 (1963); New Jersey Land Title Ins. Rating Bureau v. Sheeran, 151 N.J. Super. 45 (App.Div. 1977); Global American Ins. Managers v. Perera Co., Inc., 137 N.J. Super. 377 (Ch.Div. 1975), aff'd 144 N.J. Super. 24 (App.Div. 1976).
The action of DEP herein appealed, is affirmed.
NOTES
[1] Preliminarily, DEP asserts that since no specific dispute has yet arisen concerning the constitutional constraints placed upon DEP's right of entry, the question is not yet ripe for adjudication. DEP notes that it has not yet sought to conduct a nonconsensual inspection pursuant to the permit provision, that Vineland is not seeking to suppress evidence of a violation DEP discovered through a warrantless inspection and that DEP has not charged Vineland with violating its permit by refusing to consent to a warrantless search. Under these circumstances, or lack thereof, DEP believes an adjudication of the constitutionality of the relevant statutory scheme is premature. To the extent that N.J.S.A. 58:10A-6 provides for warrantless inspections, DEP's assertion is without merit. The harm involved is the State's right to search Vineland's premises without a warrant. Fourth Amendment rights need not be specifically violated before their protection is invoked.
[2] Focus on these early legislative enactments impacting on water pollution lends credibility to the Colonnade "historically regulated activity" exception to the warrant requirement.
[3] N.J.S.A. 58:11-18.10 et seq., by its terms, requires licensing by the Department of Health. This responsibility, however, has since been transferred to DEP. See N.J.S.A. 13:1D-7.